**PLANNED PARENTHOOD, SIOUX FALLS CLINIC; Buck J. Williams, M.D.; and Women's Medical Services, P.C., Appellees/Cross–Appellants,**

v.

**Walter D. MILLER, Governor, in his Official Capacity, and Mark W. Barnett, Attorney General, in his Official Capacity, Appellants/Cross–Appellees.**

Nos. 94–3326SD, 94–3398SD.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1995.

Decided Aug. 31, 1995.

John P. Guhin, Pierre, SD, argued (Janine Kern, Frank Geaghan and Robert Mayer, on the brief), for appellants.

Dara Klassel, New York City, argued (Beth Otten, Roger K. Evans and Michael B. Crew, on the brief), for appellees.

Before RICHARD S. ARNOLD, Chief Judge, JOHN R. GIBSON, Senior Circuit Judge, and FAGG, Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

The Governor and Attorney General of South Dakota ("the State") appeal from a District Court[1] ruling that the parental-notice provision of its abortion law is unconstitutional on its face because it fails to provide a bypass mechanism to allow mature and "best interest" minors to proceed with an abortion without notifying a parent. The State also appeals the District Court's holding that its provisions for civil and criminal penalties for performing illegal abortions are unconstitutional because they lack a scienter requirement. In the alternative, the State asks us to certify to the South Dakota Supreme Court the issue of whether that court would interpret the civil- and criminal-penalty provisions to include scienter requirements.

Planned Parenthood, Sioux Falls Clinic, Dr. Buck Williams, and Women's Medical Services (collectively, "Planned Parenthood") cross-appeal the District Court's ruling that South Dakota may constitutionally require physicians to provide certain information to all abortion patients 24 hours before the abortion is performed. They also argue that the constitutional provisions of the South Dakota law are not severable from the unconstitutional criminal- and civil-penalties provisions, and that the District Court erred in not striking the challenged Act in its entirety.

We affirm in all respects.

### I.

After South Dakota amended its abortion law in 1993, Planned Parenthood challenged the amended Act as facially unconstitutional. South Dakota's Act to Regulate the Performance of Abortion, S.D.Codified Laws Ann. § 34–23A–1 *et seq.*, amended by 1993 S.D.Laws ch. 249, restricts a woman's choice to have an abortion in several ways. Section 34–23A–7, the parental-notice provision, requires a physician or his agent to notify a pregnant minor's parent of the impending abortion 48 hours before the abortion is to be performed.[2] Section 34–23A–10.1, the man-

---

1. The Hon. Richard H. Battey, Chief Judge, United States District Court for the District of South Dakota.

2. Section 34–23A–7 provides:
   No abortion may be performed upon an unemancipated minor or upon a female for whom a guardian has been appointed because of a finding of incompetency, until at least forty-eight hours after written notice of the pending operation has been delivered in the manner specified in this section. The notice shall be addressed to the parent at the usual place of abode of the parent and delivered personally to the parent by the physician or an agent. In lieu of such delivery, notice may be made by certified mail addressed to the parent at the usual place of abode of the parent with return receipt requested and restricted delivery to the addressee, which means a postal employee can only deliver the mail to the authorized addressee. If notice is made by certified

datory-information provision, provides that no abortion may be performed unless certain information is provided to the patient at least 24 hours beforehand.[3]  Section 34–23A–22

provides for civil damages when an abortion is performed in violation of the medical-emergency provision,[4] the parental-notification provision, or the mandatory-information provision.[5]  And Section 34–23A–10.2 makes

mail, the time of delivery shall be deemed to occur at twelve o'clock noon on the next day on which regular mail delivery takes place, subsequent to mailing.

No notice is required under this section if:
(1) The attending physician certifies in the pregnant minor's medical record that, on the basis of the physician's good faith clinical judgment, a medical emergency exists that so complicates the medical condition of a pregnant female as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create a serious risk of substantial and irreversible impairment of a major bodily function and there is insufficient time to provide the required notice;  or
(2) The person who is entitled to notice certifies in writing that he has been notified;  or
(3) The pregnant minor declares, or provides information that indicates, that she is an abused or neglected child as defined in § 26–8A–2 and the attending physician has reported the alleged or suspected abuse or neglect as required in accordance with §§ 26–8A–3, 26–8A–6 and 28–6A–8.  In such circumstances, the department of social services, the state's attorney and law enforcement officers to whom the report is made or referred for investigation or litigation shall maintain the confidentiality of the fact that she has sought or obtained an abortion and shall take all necessary steps to ensure that this information is not revealed to her parents.

3.  Section 34–23A–10.1 provides:

No abortion may be performed except with the voluntary and informed consent of the female upon whom the abortion is to be performed.  Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if:
(1) The female is told the following by the physician who is to perform the abortion or by the referring physician, at least twenty-four hours before the abortion:
(a) The name of the physician who will perform the abortion;
(b) The particular medical risks associated with the particular abortion procedure to be employed including, when medically accurate, the risks of infection, hemorrhage, danger to subsequent pregnancies and infertility;
(c) The probable gestational age of the unborn child at the time the abortion is to be performed;  and
(d) The medical risks associated with carrying her child to term;
(2) The female is to be informed, by telephone or in person, by the physician who is

to perform the abortion, by the referring physician, or by an agent of either, at least twenty-four hours before the abortion:
(a) That medical assistance benefits may be available for prenatal care, childbirth and neonatal care;
(b) That the father is liable to assist in the support of her child, even in instances in which the father has offered to pay for the abortion;  and
(c) That she has the right to review the printed materials described in § 34–23A–10.3.  The physician or his agent shall orally inform the female that the materials have been provided by the State of South Dakota. If the female chooses to view the materials, they shall either be given to her at least twenty-four hours before the abortion or mailed to her at least seventy-two hours before the abortion by certified mail, restricted delivery to addressee, which means the postal employee can only deliver the mail to the addressee;
(3) The female certifies in writing, prior to the abortion, that the information described in subdivisions (1) and (2) of this section has been furnished her, and that she has been informed of her opportunity to review the information described in § 34–23A–10.3;  and
(4) Prior to the performance of the abortion, the physician who is to perform the abortion or his agent receives a copy of the written certification prescribed by subdivision (3). The physician may provide the information prescribed in subdivision (1) by telephone without conducting a physical examination or tests of the patient, in which case the information required to be supplied may be based on facts supplied the physician by the female and whatever other relevant information is reasonably available to the physician.

4.  The medical-emergency provision, Section 34–23A–2.1, provides:

If a medical emergency compels the performance of an abortion, the physician shall inform the female, prior to the abortion if possible, of the medical indications supporting his judgment that an abortion is necessary to avert her death or that delay will create serious risk of substantial and irreversible impairment of a major bodily function.

5.  Section 34–23A–22 provides:

If any abortion occurs which is not in compliance with § 34–23A–2.1, 34–23A–7, 34–23A–10.1, the person upon whom such an abortion has been performed, and the parent of a minor child upon whom such an abortion was per-

it a misdemeanor for a physician to violate the same provisions of the Act.[6]

■ Since 1973, the Supreme Court has recognized that women have a fundamental constitutional right to choose whether to terminate or continue their pregnancies. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). This right is not absolute or unqualified; instead, the woman's right to decide whether or not to carry her pregnancy to term is balanced by the State's interest in protecting both her health and the potential life of the fetus. *Id.* at 162, 93 S.Ct. at 731. After the fetus becomes viable—able to survive outside the womb—the State's interest in protecting its potential life becomes compelling enough in some circumstances to outweigh the woman's right to seek an abortion. *Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992).[7] Before viability, however, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Ibid.* The State can impose regulations designed to ensure that the woman makes a thoughtful and informed choice, but only if such regulations do not unduly burden her right to choose whether to abort. *Id.* at ——, 112 S.Ct. at 2818.

Planned Parenthood claims that South Dakota's regulations unduly burden a woman's right to choose. The State of South Dakota counters that its regulations merely ensure that the woman's choice is informed and thoughtful. On cross-motions for summary judgment, the District Court held that the parental-notice, civil-damages, and criminal-penalty provisions of South Dakota's abortion law place an undue—and thus unconstitutional—burden on a woman's right to privacy, but that the mandatory-information provision does not. Both parties appeal.

## II.

■ The critical issue in this case is a threshold one: what is the standard for a challenge to the facial constitutionality of an abortion law? The State would have us apply the test set out in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), under which "the challenger must establish that no set of circumstances exists

formed, or any of them, may maintain an action against the person who performed the abortion for ten thousand dollars in punitive damages and treble whatever actual damages the plaintiff may have sustained. Any person upon whom such an abortion has been attempted may maintain an action against the person who attempted to perform the abortion for five thousand dollars in punitive damages and treble whatever actual damages the plaintiff may have sustained.

If judgment is rendered in favor of the plaintiff in any such action, the court shall also render judgment for a reasonable attorney's fee in favor of the plaintiff against the defendant. If judgment is rendered in favor of the defendant and the court finds that the plaintiff's suit was frivolous and brought in bad faith, the court shall also render judgment for a reasonable attorney's fee in favor of the defendant against the plaintiff.

6. Section 34–23A–10.2 provides:

A physician who violates § 34–23A–2.1, 34–23A–7, 34–23A–10.1 is guilty of a Class 2 misdemeanor. The court in which a conviction of a violation of § 34–23A–2.1, 34–23A–7 or 34–23A–10.1 ... shall report such conviction to the board of medical and osteopathic examiners.

No penalty may be assessed against the female upon whom the abortion is performed or attempted to be performed. No criminal penalty or civil liability for failure to comply with subsection 34–23A–10.1(2)(c) or that portion of subsection 34–23A–10.1(3) requiring a written certification that the woman has been informed of her opportunity to review the information referred to in subsection 34–23A–10.1(2)(c) may be assessed unless the department of health has made the printed materials available at the time the physician or his agent is required to inform the female of her right to review them.

7. Our citations to *Casey,* unless otherwise noted, will be to the joint opinion of Justices O'Connor, Kennedy, and Souter. Although Justice Stevens and Justice Blackmun did not join the authors of the joint opinion in announcing the undue-burden test, they advocated an even stricter standard of review. *Casey,* —— U.S. at ——, 112 S.Ct. at 2838 (Stevens, J., concurring in part and dissenting in part); *id.* at ——, 112 S.Ct. at 2847 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part). The undue-burden test is thus the lowest common denominator. We view the joint opinion as the Supreme Court's definitive statement of the constitutional law on abortion.

under which the Act would be valid." *Saler-no,* 481 U.S. at 745, 107 S.Ct. at 2100. Planned Parenthood, on the other hand, contends that the Supreme Court replaced the *Salerno* test in *Casey,* —— U.S. ——, 112 S.Ct. 2791. Under *Casey,* it claims, an abortion law is unconstitutional on its face if, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* at ——, 112 S.Ct. at 2830.

The Supreme Court had previously applied *Salerno* in striking down facial challenges to abortion laws. See *Rust v. Sullivan,* 500 U.S. 173, 182–84, 111 S.Ct. 1759, 1766–68, 114 L.Ed.2d 233 (1991); *Webster v. Reproductive Health Services,* 492 U.S. 490, 524, 109 S.Ct. 3040, 3059–60, 106 L.Ed.2d 410 (1989). But a majority of the Court in *Casey* applied a different test—the one Planned Parenthood advocates here—in determining that Pennsylvania's spousal-notification law was facially invalid. Chief Justice Rehnquist highlighted this departure in his dissent in *Casey,* arguing that "it is insufficient for petitioners to show that the [spousal] notification provision 'might operate unconstitutionally under some conceivable set of circumstances.'" *Casey,* —— U.S. at ——, 112 S.Ct. at 2870 (quoting *Salerno,* 481 U.S. at 745, 107 S.Ct. at 2100). The majority made no response to this contention. Indeed, even though the joint opinion's authors "carefully reviewed and selectively departed from other earlier precedent," *Fargo Women's Health Org. v. Schafer,* 18 F.3d 526, 529 (8th Cir.1994), they did not expressly reject *Salerno,* even though applying a test incompatible with it.

Other circuits have split on the question whether *Casey* effectively overruled *Salerno* for abortion cases. The Third Circuit believes that the Supreme Court "set a new standard for facial challenges to pre-viability abortion laws." *Casey v. Planned Parenthood,* 14 F.3d 848, 863 n. 21 (3d Cir.1994) (on remand) (dicta). The Fifth Circuit, however, refused to "interpret *Casey* as having overruled, *sub silentio,* longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes," and it

continues to apply the *Salerno* standard. *Barnes v. Moore,* 970 F.2d 12, 14 & n. 2 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992).

Indeed, even the Justices of the Supreme Court dispute *Casey's* effect. Justice Scalia, joined by Chief Justice Rehnquist and Justice White, has stated that the only exception to the *Salerno* standard is for First Amendment cases, and "[t]he Court did not purport to change this well-established rule [in *Casey*]." *Ada v. Guam Soc'y of Obstetricians & Gynecologists,* —— U.S. ——, ——, 113 S.Ct. 633, 634, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting from the denial of certiorari). But Justice O'Connor, joined by Justice Souter, has emphasized that the Supreme Court in *Casey* "did not require petitioners to show that the provision would be invalid in all circumstances. Rather, we made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Fargo Women's Health Org. v. Schafer,* —— U.S. ——, ——, 113 S.Ct. 1668, 1669, 123 L.Ed.2d 285 (1993) (O'Connor, J., concurring in the denial of a stay pending appeal).

We cannot know how the Supreme Court will ultimately resolve this issue, but we must now decide it for ourselves. We were able to avoid the issue of which standard to follow in *Fargo Women's Health Organization v. Schafer, supra,* 18 F.3d 526. The result in that case would have been the same no matter which test was applied. *Id.* at 529–30, 532–33. Here, though, Planned Parenthood cannot meet the *Salerno* test, for circumstances exist under which the South Dakota law would be constitutional—its restrictions, for example, would be quite valid after a pregnancy had progressed past the point of viability. But Planned Parenthood could meet *Casey's* undue-burden test if, for example, the parental-notice law would be a substantial obstacle to a "large fraction" of minor women seeking pre-viability abortions. Thus, the standard we choose to follow today may well determine the outcome of this case.

We choose to follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue-burden test. It is true that the Court did not expressly reject *Salerno*'s application in abortion cases, but it is equally true that the Court did not apply *Salerno* in *Casey*. If it had, it would have had to uphold Pennsylvania's spousal-notification law, because that law imposed "almost no burden at all for the vast majority of women seeking abortions." *Casey*, —— U.S. at ——, 112 S.Ct. at 2829. Instead, the Court held that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at ——, 112 S.Ct. at 2829. If the law will operate as a substantial obstacle to a woman's choice to undergo an abortion "in a large fraction of the cases in which [it] is relevant, ... [i]t is an undue burden, and therefore invalid." *Id.* at ——, 112 S.Ct. at 2830.

We believe the Court effectively overruled *Salerno* for facial challenges to abortion statutes. We will therefore apply the *Casey* standard to determine if South Dakota's Act to Regulate the Performance of Abortion is constitutional on its face.

### III.

We turn first to the Act's parental-notice provision, S.D.C.L. § 34–23A–7. Under that provision, physicians must notify one of a pregnant minor's parents of the intended abortion at least 48 hours before performing the abortion unless: (1) the physician has certified that a medical emergency exists; (2) the parent has certified that he or she has been notified; or (3) the physician has reported to the appropriate authorities that the minor has declared or indicated that she is an abused or neglected child. A physician who performs an abortion on a minor without notifying her parent or meeting one of these exceptions is subject to both criminal and civil penalties.

The District Court began its analysis of the constitutionality of this provision by looking to prior Supreme Court cases involving parental-notice and parental-consent laws. It found no case on point, but it concluded that "[s]tate and parental interests must yield to the constitutional right of a mature minor, or of an immature minor whose best interests are contrary to parental involvement, to obtain an abortion without consulting or notifying the parent or parents." *Planned Parenthood v. Miller*, 860 F.Supp. 1409, 1415 (D.S.D.1994). The District Court determined that a minor is entitled to a procedure designed to bypass the parental-notice requirement by allowing the minor to proceed with the abortion if she can show that she has the maturity to make her decision independently of her parent's advice or, even if she lacks such maturity, that having an abortion without notifying her parents would be in her best interests. *Ibid.* Since the South Dakota law lacks such a bypass procedure, the District Court held that it was unconstitutional. *Id.* at 1416.

The State argues that parental-notice laws do not need a bypass procedure to be constitutional. It argues that the Supreme Court has required bypass procedures only for consent statutes and that five Justices have agreed that "notice statutes are not equivalent to consent statutes." *Ohio v. Akron Center for Reproductive Health (Akron II )*, 497 U.S. 502, 511, 110 S.Ct. 2972, 2978, 111 L.Ed.2d 405 (1990). Planned Parenthood counters that even though notice and consent statutes are not equivalent, they may, as a practical matter, impose the same burden. If that burden is undue under consent statutes without a bypass, then it should be undue under notice statutes without a bypass.

The State responds that even if a parental-notice provision needs a bypass to be constitutional, its "doctor bypass" for abused and neglected minors should suffice. Indeed, the State claims that its bypass is less of a burden than the judicial bypass required for consent statutes. Planned Parenthood disputes that claim and points out that South Dakota's bypass for abused and neglected minors does not provide an alternative to parental notice for mature or "best interest" minors who have not been mistreated. We agree with Planned Parenthood on this point.

### A.

We begin, as the District Court did, with a review of Supreme Court precedent.

"An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey,* —— U.S. at ——, 112 S.Ct. at 2821. The Court has established that a parental-*consent* requirement is not an undue burden for minors seeking abortions so long as the minor has the opportunity to avoid the requirement by demonstrating that she is mature or that an abortion is in her best interests. *Bellotti v. Baird,* 443 U.S. 622, 651, 99 S.Ct. 3035, 3052–53, 61 L.Ed.2d 797 (1979) (plurality). See also *City of Akron v. Akron Center for Reproductive Health (Akron I),* 462 U.S. 416, 440, 103 S.Ct. 2481, 2497–98, 76 L.Ed.2d 687 (1983) (following *Bellotti* by invalidating a consent statute that made "a blanket determination that all minors under the age of 15 are too immature to make [an abortion] decision or that an abortion never may be in the minor's best interests without parental approval"). Under *Bellotti,* consent statutes must have an expeditious, anonymous bypass procedure that allows a minor to show either that she has the maturity to make her own abortion decision or, even if she is immature, that the desired abortion would be in her best interests. *Bellotti,* 443 U.S. at 643–44, 99 S.Ct. at 3048–49; *Akron II,* 497 U.S. at 511–13, 110 S.Ct. at 2979–80 (reviewing criteria for bypass). Without that opportunity, the consent requirement unduly burdens the minor's right to choose.

As for notice requirements, the Supreme Court has established that the State may require parental notice for immature minors who cannot show that an abortion would be in their best interests. *H.L. v. Matheson,* 450 U.S. 398, 409, 101 S.Ct. 1164, 1171, 67 L.Ed.2d 388 (1981); *id.* at 414, 101 S.Ct. at 1173–74 (Powell, J., concurring). On the other hand, the Court has held that a statute requiring notice to *both* parents is unconstitutional without a bypass procedure, but constitutional with one.[8] *Hodgson v. Minnesota,* 497 U.S. 417, 461, 110 S.Ct. 2926, 2950–51, 111 L.Ed.2d 344 (1990) (O'Connor, J., concurring in part and concurring in the judgment in part); *id.* at 481, 110 S.Ct. at 2961 (Kennedy, J., concurring in the judgment in part and dissenting in part). As *Hodgson* made clear, some of the Justices would hold that requiring one-parent notice is unconstitutional even with a bypass procedure, while others would hold that a more restrictive two-parent notice requirement is constitutional even without a bypass. *Id.* at 462, 110 S.Ct. at 2951 (Marshall, J., concurring in part, concurring in the judgment in part, and dissenting in part); *id.* at 489, 110 S.Ct. at 2965–66 (Kennedy, J., concurring in the judgment in part and dissenting in part). In short, the Supreme Court has yet to decide whether a mature or "best interest" minor is unduly burdened when a State requires her physician to notify one of her parents before performing the abortion.

To resolve that issue, we first consider why requiring parental notice—or, for that matter, parental consent—is *not* an undue burden on immature minors who cannot show that an abortion would be in their best interests. After all, "many parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct ... an abortion...." *Bellotti,* 443 U.S. at 647, 99 S.Ct. at 3050. Notifying the parent of the daughter's intentions 48 hours before the abortion can be performed gives the parent the opportunity to obstruct the daughter's choice, just as requiring consent gives parents the tool with which to do so. The possibility of such obstruction—or even attempted obstruction—might be considered a substantial ob-

---

8. The Court was sharply divided in *Hodgson,* with four Justices holding that a two-parent notice requirement is constitutional with or without bypass, four Justices holding that it is unconstitutional with or without bypass, and one Justice—Justice O'Connor—holding that it is unconstitutional without a bypass, but constitutional with one. *Id.* at 479, 110 S.Ct. at 2960 (Scalia, J., concurring in the judgment in part and dissenting in part) (summarizing the holdings). Justice O'Connor held that the two-parent notice requirement, which required the minor to notify both parents even when one parent agreed that the other should not be notified, unduly interfered in internal family operations, but she found that this problem "simply does not exist where the minor can avoid notifying one or both parents by use of the bypass procedure." *Id.* at 461, 110 S.Ct. at 2951 (O'Connor, J., concurring in part and concurring in the judgment in part).

stacle for a large fraction of minors seeking pre-viability abortions. *Cf. Casey,* —— U.S. at ——–——, 112 S.Ct. at 2829–30 (holding that spousal-notice requirement imposed substantial obstacle for a large fraction of married women seeking abortions who did not wish to notify their husbands of their intentions because of the very real possibility that their husbands would try to obstruct the abortion). Why, then, has the Court found that immature minors are not unduly burdened by this obstacle?

The answer, of course, is that they are minors, and States may impose requirements on immature minors that it may not impose on adults. *Akron I,* 462 U.S. at 427 n. 10, 103 S.Ct. at 2491 n. 10. Immature minors are simply not capable of making the informed, independent decisions that adults can. See *id.; Bellotti,* 443 U.S. at 635–36, 99 S.Ct. at 3043–44; *Hodgson,* 497 U.S. at 458–59, 110 S.Ct. at 2949–50 (O'Connor, J., concurring in part and concurring in the judgment in part). "As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor." *Bellotti,* 443 U.S. at 640, 99 S.Ct. at 3046 (quoted by Justice O'Connor in *Hodgson,* 497 U.S. at 458, 110 S.Ct. at 2949).

The State can thus give parents a chance—or even a tool—to obstruct their immature, non-best-interests daughter's decision to have an abortion without violating the Constitution. The State runs afoul of the Constitution, however, when it attempts to give that same power to parents of mature daughters capable of making their own informed choices. *Bellotti,* 443 U.S. at 643–44 & n. 23, 99 S.Ct. at 3048–49 & n. 23. Because maturity does not always correspond to the age of majority, minors must have the chance to demonstrate their maturity. *Id.* at 650, 99 S.Ct. at 3051–52. See also *id.* at 644 n. 23, 99 S.Ct. at 3048 n. 23 ("[T]he peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors."). By

showing that they are capable of mature, informed consideration, such minors establish that the State has no legitimate reason for imposing a restriction on their liberty interests that it could not impose on adult women.

As for immature minors whose best interests would be served by having an abortion, "the justification for any rule requiring parental involvement in the abortion decision rests entirely on the best interests of the child." *Hodgson,* 497 U.S. at 454, 110 S.Ct. at 2947. States may generally require the parent's involvement in an immature minor's abortion decision because it is presumed that a parent will act in the minor's best interest. But if the minor can show that an abortion without notification would be in her best interest, then the State has no further reason for requiring such notice.

For both mature and "best interest" minors, then, the State has no legitimate interest in imposing a parental-notice requirement with the purpose or effect of placing a substantial obstacle in their paths when they seek pre-viability abortions. For this reason, we hold that the State may not impose a parental-notice requirement without also providing a confidential, expeditious mechanism by which mature and "best interest" minors can avoid it. In short, parental-notice provisions, like parental-consent provisions, are unconstitutional without a *Bellotti*-type bypass. We do not think that requiring notice to only one parent avoids this problem. Such a requirement still places a substantial obstacle in the way of a mature or best-interests minor's right to choose.

### B.

▮ The State claims that its exception for abused and neglected minors satisfies any need for a bypass procedure. That exception allows an abortion to be performed on a pregnant minor without notice to a parent if her physician has reported to the appropriate authorities that the minor has indicated that she is "abused or neglected" as defined by S.D.C.L. § 26–8A–2.[9] The State contends

9. Section 26–8A–2 defines an "abused or neglected child" as a child:

(1) Whose parent, guardian or custodian has abandoned the child or has subjected the child to mistreatment or abuse;

that this exception is enough to salvage the constitutionality of its notice provision.

We disagree. South Dakota's exception for abused and neglected minors does not save the notice provision because it does not provide a mechanism by which minors can avoid parental notice by demonstrating to an independent decisionmaker that they are mature or that an abortion would be in their best interests. And while the abuse exception is expeditious—the abortion may be performed 24 hours after the abuse has been reported—it fails to preserve the minor's anonymity or even confidentiality.

### 1.

South Dakota's "bypass" for abused and neglected minors falls short of protecting the confidentiality of the minor's decision to have an abortion. The statute provides that "the department of social services, the state's attorney and law enforcement officers . . . shall maintain the confidentiality of the fact that she has sought or obtained an abortion." S.D.C.L. § 34–23A–7(3). Nothing, however, prevents a court from ordering production of that information during discovery in a later abuse proceeding. South Dakota law provides numerous opportunities for a parent accused of child abuse to obtain the physician's report of the daughter's abuse. See S.D.C.L. § 26–7A–29 (juvenile court may release information on a child to the child's parent); § 26–7A–37 (child's parent authorized to inspect all records of court proceedings, including reports of the Department of Social Services); § 26–7A–58 (respondent parent may inspect or copy any relevant written or recorded statement made by child); § 26–7A–60 (respondent parent may

(2) Who lacks proper parental care through actions or omissions of the child's parent, guardian or custodian;

(3) Whose environment is injurious to the child's welfare;

(4) Whose parent, guardian or custodian fails or refuses to provide proper or necessary subsistence, supervision, education, medical care or any other care necessary for the child's health, guidance or well-being;

(5) Who is homeless, without proper care, or not domiciled with the child's parent, guardian or custodian through no fault of the child's parent, guardian or custodian;

copy any document used in the state's case). In a state where there is only one doctor who performs abortions, the minor's decision to seek an abortion would be revealed merely by the name of the reporting physician. That decision would certainly come to light when the State called the doctor who reported the abuse to testify in the abuse proceeding. In practice, it seems, South Dakota's abuse exception will sometimes result in parental notification, even if after-the-fact. *Cf. Hodgson,* 497 U.S. at 460, 110 S.Ct. at 2950 (O'Connor, J.) (holding that abuse exception was not a viable alternative because the minor's reluctance to report abuse combined with "the likelihood that invoking the abuse exception . . . will result in notice," made the abuse exception "less than effectual").

### 2.

South Dakota's abuse exception also fails to provide the minor access to an independent decisionmaker. See *Planned Parenthood Assoc. of Kansas City, Missouri, Inc. v. Ashcroft,* 462 U.S. 476, 492 n. 20, 103 S.Ct. 2517, 2526 n. 20, 76 L.Ed.2d 733 (1983) (indicating that a minor should have access to an independent decisionmaker). The State correctly points out that the Supreme Court has not required that bypass procedures be judicial. *Ibid.* (declining to decide "whether a qualified and independent nonjudicial decisionmaker would be appropriate"). In establishing the criteria for bypass procedures, the plurality in *Bellotti* noted:

> We do not suggest . . . that a State choosing to require parental consent could not delegate the alternative procedure to a juvenile court or an administrative agency or officer. Indeed, much can be said for

(6) Who is threatened with substantial harm;

(7) Who has sustained emotional harm or mental injury as indicated by an injury to the child's intellectual or psychological capacity evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior, with due regard to the child's culture; or

(8) Who is subject to sexual abuse, sexual molestation or sexual exploitation by the child's parent, guardian, or custodian or any other person responsible for the child's care.

employing procedures and a forum less formal than those associated with a court of general jurisdiction.

*Bellotti,* 443 U.S. at 643 n. 22, 99 S.Ct. at 3048 n. 22.

Even if bypass procedures can be conducted by nonjudicial decisionmakers, a point we need not decide, such decisionmakers must at least be independent. We agree with the District Court that "[a]n effective, alternative bypass procedure would place the decision in the hands of a neutral and detached agency ... which would be able to take into consideration the competing interests involved in the abortion decision." *Planned Parenthood,* 860 F.Supp. at 1416. And as the District Court noted, "[t]he physician performing the abortion can hardly be said to be the neutral and detached agency." *Ibid.*

### 3.

■ The most fundamental flaw in South Dakota's abuse exception is its failure to allow a neutral decisionmaker to decide, on a case-by-case basis, whether a minor is mature enough to make her own decision or whether an abortion is in her best interests. *Akron II,* 497 U.S. at 522, 110 S.Ct. at 2994 (Stevens, J.) ("Although it need not take the form of a judicial bypass, the State must provide an adequate mechanism for cases in which the minor is mature or notice would not be in her best interests."). The whole point of a bypass procedure is to allow the minor to show that the State's justification for requiring parental notice—that minors are immature and in need of guidance for their own best interests—does not apply to her, either because she is mature or because an abortion is actually in her best interest.

South Dakota's "abused or neglected child" exception does not allow minors this opportunity. The State responds that Planned Parenthood has not shown the existence of a "large fraction" of minors in need of this opportunity. It contends that parental notice imposes no burden on mature minors because any truly mature minor would be willing to inform her parent of her intentions. This is a specious argument. Even if a minor is mature and willing to tell her parent, if need be, about her pregnancy and intent to obtain an abortion, she may have good reasons for deciding not to—such as choosing to wait until a more appropriate moment, wishing to avoid causing unnecessary pain, or desiring to reduce potential strife by presenting a fait accompli—just as an adult woman might have good reasons for deciding not to tell her spouse or parent. If a minor can demonstrate that she is mature, the State has no legitimate reason for imposing liberty restrictions upon her that it may not impose on an adult.

The State also argues that Planned Parenthood has failed to prove the existence of minors who could show that an abortion is in their best interests yet who do not fall under South Dakota's abuse exception. On the contrary, Planned Parenthood has submitted affidavits citing studies that show that a stressful, but non-abusive, parent-child relationship can become abusive or neglectful after the parent learns of the daughter's pregnancy or desire to have an abortion.[10] Declaration of Mary Jones, ¶ 5; Council on Ethical and Judicial Affairs, American Medical Association, *Mandatory Parental Consent to Abortion,* 269 JAMA 82, 83 (1993). An abortion without parental notification might be in this minor's best interest, but she would not qualify for South Dakota's abuse exception. Planned Parenthood also points out that non-abusive parents who differ from their daughters on religious or moral grounds over abortion may be prepared to prevent their daughters from obtaining abortions even when those abortions are in the daughters' best interests. *Bellotti,* 443 U.S. at 647, 99 S.Ct. at 3050; Declaration of Buck Williams, ¶ 28 (honor-student minor feared parents ideologically opposed to abortion would prevent her from having abortion; when father learned daughter was at clinic, he assaulted staff members and forced daughter to leave); Declaration of Gail Kelly, ¶ 8; Declaration of Carol Knudtson, ¶ 7; Declaration of Joan

---

**10.** It is no answer to say that the minor could simply notify her other parent. Roughly eighteen per cent. of South Dakota's minors live in single-parent homes; many of them, as a prac-

tical matter, have only one parent to notify. Declaration of De Vee Dykstra, Exhibit E (1990 census information). See *Hodgson,* 497 U.S. at 437–38, 110 S.Ct. at 2938–39.

Williams, ¶ 19. Failing to provide a bypass option for these minors undermines the State's justification for requiring notice in the first place: to ensure that the minors' best interests are served.

Finally, Planned Parenthood has submitted numerous affidavits demonstrating that many minors who are abused will not be able to use the abuse exception. The abuser often instills secrecy in the child, to such an extent that victims have trouble talking about the abuse years or even decades later. Knudtson Declaration, ¶ 8; Jones Declaration ¶¶ 3, 4. *Cf. Casey,* —— U.S. at ——, 112 S.Ct. at 2827. Many children blame themselves for the abuse and are very protective of the abusive parent. Knudtson Declaration, ¶ 8; Jones Declaration, ¶ 3; Declaration of Penny Virchow, ¶ 9. A minor faced with the untenable choice of turning in her parent or forgoing an abortion will often delay her decision until it is too late; she may even commit suicide rather than choose between two such agonizing choices. Jones Declaration, ¶ 4. Even if South Dakota's exception were otherwise acceptable, its failure to provide an alternative procedure for these minors would doom it.

Planned Parenthood has shown that a large fraction of minors seeking pre-viability abortions would be unduly burdened by South Dakota's parental-notice statute, despite its abuse exception. We affirm the District Court and hold that S.D.C.L. § 34–23A–7 is unconstitutional on its face.

### IV.

The District Court also struck the civil-damages and criminal-penalty provisions of the Act, S.D.C.L. §§ 34–23A–10.2 and 34–23A–22. Section 34–23A–10.2 makes a physician's violation of the parental-notice, mandatory-information, or medical-emergency provisions a Class 2 misdemeanor, punishable by a 30-day imprisonment, a $200 fine, and a report of the conviction to the board of medical examiners. Section 34–23A–22 allows a cause of action "for ten thousand dollars in punitive damages and treble whatever actual damages the plaintiff may have sustained" against a physician who violates the same provisions.

Neither section contains a scienter requirement on its face. The State, contending that South Dakota courts would nonetheless read a scienter requirement into each section, asked the District Court to certify the issue of the interpretation of the statutes to the South Dakota Supreme Court. The District Court declined to do so, finding that the State's claim of implied scienter "is of little comfort to a physician who wishes to conform his conduct to the law." *Planned Parenthood,* 860 F.Supp. at 1420. The Court held that the criminal provision's lack of mens rea made it unconstitutionally vague, creating a "chilling effect" so that physicians, who cannot guess the standard under which the courts will judge their conduct, would choose not to act at all. *Ibid.* It also held that the strict liability of the civil-damages section unduly burdens a woman's decision to have an abortion by making it unlikely that any physician would be willing to perform it. *Id.* at 1418.

■ The State appeals these holdings, asking us to certify the interpretation of these provisions to the South Dakota Supreme Court. We find no need to do so. Certification to a state court is appropriate when the state court's construction of an uncertain state law could make resolution of federal constitutional questions unnecessary. See *Clay v. Sun Ins. Office, Ltd.,* 363 U.S. 207, 211–12, 80 S.Ct. 1222, 1225–26, 4 L.Ed.2d 1170 (1960). Certification is not necessary, though, where the statute is "neither ambiguous nor obviously susceptible of a limiting construction." *Houston v. Hill,* 482 U.S. 451, 471, 107 S.Ct. 2502, 2514, 96 L.Ed.2d 398 (1987). See also *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 237, 104 S.Ct. 2321, 2327–28, 81 L.Ed.2d 186 (1984) (no need to abstain when Act unambiguous and no other provision of state law suggests that Act "does not mean exactly what it says"); *Colorado River Water Const. Dist. v. United States,* 424 U.S. 800, 815 n. 21, 96 S.Ct. 1236, 1245 n. 21, 47 L.Ed.2d 483 (1976) ("[T]he opportunity to avoid decision of a constitutional question does not alone justify abstention by a federal court.").

## A.

■ On its face, the criminal-penalty provision is unambiguous: it simply states that performing an abortion in violation of certain provisions of the Act is a crime. There is no need for construction when a statute's language is clear and unambiguous, see *US West v. Public Utilities Comm'n,* 505 N.W.2d 115, 123 (S.D.1993), but courts must read statutes as constitutional whenever possible. *State v. Stone,* 467 N.W.2d 905, 906 (S.D.1991). Would the South Dakota Supreme Court construe this unambiguous statute to have a scienter requirement in order to save it?

■ We think not. The South Dakota Supreme Court has established a test for when it will undertake to read a scienter requirement into a statute that completely lacks one. *State v. Barr,* 90 S.D. 9, 237 N.W.2d 888, 891–93 (1976); *Stone,* 467 N.W.2d at 906. "Whether criminal intent or guilty knowledge is an essential element of a statutory offense is to be determined by the language of the act in connection with its manifest purpose and design." *State v. Nagel,* 279 N.W.2d 911, 915 (S.D.1979). If the statute's language lacks any indication of mens rea, the South Dakota Supreme Court looks at what courts in other jurisdictions have done with similar statutes, particularly when there is a need to maintain uniformity; it then determines whether lesser crimes include a scienter element, making the lack of scienter in the greater crime anomalous; and finally, it looks at whether the State contends that there is a scienter element in the statute. *Barr,* 237 N.W.2d at 891–93; *Stone,* 467 N.W.2d at 906.

Planned Parenthood argues that the South Dakota Supreme Court would undertake this analysis only for statutes modeled on uniform acts. There is some support for this: *Barr* and *Stone* are the only cases in which the South Dakota Supreme Court has read a scienter requirement into a statute complete-

ly lacking one, and both involved uniform narcotic laws. We need not decide this issue, however, for the criminal provision here cannot pass the state Supreme Court's test even if that Court were to apply it.

For the first step in the analysis, the South Dakota Supreme Court would look at what other courts have done with similar provisions. In *Barr* and *Stone,* the Supreme Court observed that the courts in other jurisdictions with similar statutes uniformly read a scienter element into the scienter-less statute. *Barr,* 237 N.W.2d at 891; *Stone,* 467 N.W.2d at 906. Here, however, no such body of law exists.

The State points us to *Baird v. Attorney General,* 371 Mass. 741, 360 N.E.2d 288 (1977), a case in which the Massachusetts Supreme Court held that a physician could claim a good-faith, reasonable mistake as to a minor's age when prosecuted for performing an abortion on a minor without her parent's consent, even though the abortion statute contained no scienter element. That court, however, found a scienter element in the state's general law on parental consent for medical care, which allowed physicians to assert a good-faith mistake as to the minor's age as a defense. *Id.* 360 N.E.2d at 302. South Dakota has no general law on medical consent for minors.

Our Court also looked to an outside statute to resolve a case involving an abortion statute that had a scienter element for only part of the crime. In *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft,* 655 F.2d 848 (8th Cir.1981), *aff'd in part, rev'd in part,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), we found that a Missouri abortion statute which proscribed "knowingly perform[ing]" an abortion in violation of its provisions did not lack a scienter requirement because Missouri had a statute providing that the culpable mental state—knowingly— extended to each material element of the crime.[11] *Ashcroft,* 655 F.2d at 861–62.

---

11. Along the same lines, the State refers us to *United States v. X–Citement Video,* —— U.S. ——, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), a recent Supreme Court decision holding that the scienter element contained in the first paragraph of a statutory section applied to all of the subpara-

graphs. *Cf. Colautti v. Franklin,* 439 U.S. 379, 394–95, 99 S.Ct. 675, 685–86, 58 L.Ed.2d 596 (1979) (refusing to extend the scienter requirements regarding intention to cause the death of the fetus to the determination of viability); *Schulte v. Douglas,* 567 F.Supp. 522, 527–28

The courts in these cases, however, had another statute available to provide scienter. We have not found—and the parties have not cited—any case where a court read a scienter requirement into an abortion statute that, on its face, contained no such element when no secondary statute providing scienter existed. There is thus no body of law to persuade the South Dakota Supreme Court to read beyond the plain language of the statute.

The statute here would also fail the second step of the *Barr* analysis. In *Barr* and *Stone,* the South Dakota Supreme Court looked at similar crimes with lesser penalties that contained a scienter element and found that "it would be anomalous to hold that the legislature intended to require a lesser burden of proof . . . in those offenses carrying the more serious . . . penalty." *Barr,* 237 N.W.2d at 891. On the other hand, the Court also noted that, "[w]ere it not for the apparently uniform holdings of other courts . . . that knowledge is an element" in the statute, the legislature's careful enumeration of scienter elements in related crimes could also lead to the opposite conclusion: that the legislature had deliberately omitted such an element in the statute before it. *Id.* at 892. After all, "[t]he intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used." *US West,* 505 N.W.2d at 123.

Here, of course, there are no "apparently uniform holdings of other courts" that abortion statutes contain implicit scienter elements. There are also no "lesser crimes" involving violation of the abortion Act. The State argues that an anomaly exists here because certain provisions of the Act to Regulate the Performance of Abortion cannot be violated without a culpable mental state. Thus, it contends, the Act's definition of "medical emergency" as based on the physician's good-faith clinical judgment, S.D.C.L. § 34–23A–7(1), and of "abortion" as the intentional termination of a pregnancy with knowledge that the death of the fetus will

result, S.D.C.L. § 34–23A–1(1), is inconsistent with the lack of scienter in the remainder of the Act. We think it likely that the South Dakota Supreme Court would find that these provisions demonstrate the legislature's intent not to require scienter for the Act's other provisions. See *Nagel,* 279 N.W.2d at 916 (fact that another section of the same securities chapter required intent demonstrated that legislature purposefully omitted scienter requirement from securities law at issue).

The third step of the South Dakota Supreme Court's analysis would be easy to meet, since the State admits that the statute has no scienter element. The State maintains instead that state courts would read such an element into the statute, despite its plain language. That seems highly unlikely, given that this third step is the only part of the *Barr* analysis that this statute could pass. The Attorney General's view of the statute is surely not enough in itself to justify reading text into a statute where no such text exists.

■ We conclude that the South Dakota Supreme Court would not read a scienter element into the plain language of this statute. Since the statute is unambiguous and not easily susceptible to a limiting construction, we find no reason to certify this issue.

■ We also hold that, without a scienter requirement, this strict criminal-liability statute will have a "profound chilling effect on the willingness of physicians to perform abortions." *Colautti,* 439 U.S. at 396, 99 S.Ct. at 686; *Ashcroft,* 655 F.2d at 861. It thus creates a substantial obstacle to a woman's right to have a pre-viability abortion in the state of South Dakota. We affirm the District Court's decision to strike Section 34–23A–10.2 as unconstitutional.

### B.

■ The civil-damages provision is similarly unambiguous. It simply provides for the trebling of actual damages and a speci-

---

(D.Neb.1981), *aff'd sub nom. Womens Services, P.C. v. Douglas,* 710 F.2d 465 (8th Cir.1983) (per curiam) (refusing to extend intent provision for the determination of viability to the subsequent section providing an exception for maternal health). Here the criminal-penalty provision contains no scienter requirement at all. There is thus nothing for us to extend.

fied amount of punitive damages upon a showing that the defendant violated one of the Act's provisions. This is a strict-liability statute that fixes the amount of damages, and we do not believe that the South Dakota Supreme Court would rule any differently.

The State argues that the statute must be read in conjunction with S.D.C.L. § 21–1–4.1, which requires a court to determine that there is a reasonable basis to believe that the defendant acted with either presumed or actual malice before the issue of punitive damages can be submitted to the trier of fact. *Kjerstad v. Ravellette Publications*, 517 N.W.2d 419, 425 (S.D.1994); *Dahl v. Sittner*, 474 N.W.2d 897, 900–901 (S.D.1991). But Section 21–1–4.1 does not add a scienter requirement to Section 34–23A–22. Instead, it creates a procedural threshold that the plaintiff must pass before the court will submit the issue of punitive damages to the jury. *Dahl*, 474 N.W.2d at 902. Once that threshold is passed, the statute "leaves unchanged the substantive nature of the availability of punitive damages." *Ibid.*

Section 21–1–4.1 ensures that there is enough culpability to warrant submitting the issue of punitive damages to the jury, but it does nothing to ensure that the jury itself must find any culpability before awarding punitive damages. *Ibid.* The trier of fact determines the appropriateness of punitive damages under the requirements of the statute that provides for them—in this case, the strict-liability standard of the Act's civil-damages section. *Ibid.* (noting that Section 21–1–4.1 "does not alter the standard of proof required to recover on a punitive damages claim"). Under that standard, it is irrelevant whether the defendant's conduct was actually willful, wanton, or malicious. To award punitive damages under Section 34–23A–22, the jury need find only that the defendant violated the parental-notice, mandatory-information, or medical-emergency provisions of the Act. And once the jury decides to award punitive damages, it has no discretion over the amount of damages to award: the statute fixes it at $10,000.

The State claims that the statute creates a $10,000 cap, rather than a $10,000 award, but that argument is belied by the language of the statute. The civil-damages provision states that the plaintiff "may maintain an action ... *for* ten thousand dollars in punitive damages." S.D.C.L. § 34–23A–22 (emphasis added). "For" denotes equivalency; one would hardly argue that a "bill for $50" establishes a ceiling rather than the exact amount due. Moreover, a review of other South Dakota statutes reveals that the legislature knows how to set a cap on punitive damages when it wants to. See S.D.C.L. § 23A–28B–35 (allowing punitive damages for a fraudulent claim to the crime victims' compensation board of "not more than double the amount of damages the state has sustained"); § 30–17–8 (providing for punitive damages "not to exceed the value" of the decedent's estate); § 37–29–3 (providing for punitive damages for willful and malicious trademark appropriation "not exceeding twice" other damages); § 43–32–24 (allowing punitive damages for bad faith retention of rent, "not to exceed $200"). See also § 21–3–11 (providing that damages in medical malpractice action may not exceed $1,000,000).

A punitive damage award based on strict liability and fixed by statute fails to ensure that "[t]he allowance and amount of punitive damages turns on the particular facts of each case." *Wangen v. Knudson*, 428 N.W.2d 242, 246 (S.D.1988). A jury usually has the discretion to determine whether the facts of the case warrant an award of punitive damages and, if so, what amount would serve to deter and punish the wrongdoer. Indeed, the South Dakota Supreme Court has established five factors that the trier of fact should consider in determining the amount of punitive damages to award. *Wangen*, 428 N.W.2d at 246. Section 34–23A–22, however, does not allow the trier of fact to determine the amount of punitive damages to impose for a violation of the abortion Act. The five factors would never come into play under this statute, leaving nothing to ensure that the award has "some understandable relationship to compensatory damages" and is "not grossly out of proportion to the severity of the offense." *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991).

Since the civil-damages provision allows punitive damages on a strict-liability basis, it is quite possible that the statutorily fixed $10,000 award will be grossly out of proportion to the severity of the offense. A physi-

cian who performs an abortion on a minor who he reasonably believes is more than eighteen years old is strictly liable for his conduct, as is a physician who in good faith supplies the mandatory information over the phone to the wrong person. The potential civil liability for even good-faith, reasonable mistakes is more than enough to chill the willingness of physicians to perform abortions in South Dakota. See *Colautti,* 439 U.S. at 396, 99 S.Ct. at 686. We therefore hold that Section 34–23A–22 is an undue burden on a woman's right to choose whether to terminate her pre-viability pregnancy.

### V.

■ Planned Parenthood cross-appeals the District Court's decision to uphold South Dakota's mandatory-information provision, S.D.C.L. § 34–23A–10.1. That provision requires that the patient be told the name of the doctor who will perform the abortion, the probable gestational age of the fetus, and the medical risks of both continuing and terminating the pregnancy. It also requires that she be informed that medical assistance benefits may be available for prenatal care and childbirth, that the father would be liable for child support, and that printed materials are available for her to review about fetal development, adoption services, and public-assistance benefits. All of this information must be provided to the patient 24 hours before the abortion, and she must certify in writing that she received it. The only exception to the mandatory-information provision is for a medical emergency.

South Dakota's provision is substantially similar to provisions upheld by the Supreme Court in *Casey* and by this Court in *Fargo Women's Health Organization v. Schafer. Casey,* —— U.S. at —— – ——, 112 S.Ct. at 2822–26; *Schafer,* 18 F.3d at 532–34. The Pennsylvania provision approved of in *Casey* provided two exceptions not found here: the information on the father's liability for child support could be omitted for rape victims, and other information could be omitted if the physician reasonably believed that providing the information could severely hurt the patient's physical or mental health. 18 Pa. Cons.Stat.Ann. §§ 3205(a)(2)(iii), 3205(c); *Casey,* —— U.S. at ——, 112 S.Ct. at 2824. Planned Parenthood contends that the lack of such exceptions in the South Dakota law makes it unconstitutional on its face.

We decided this issue in *Fargo Women's Health Organization v. Schafer,* where we upheld a North Dakota law similar to the one at issue here. *Schafer,* 18 F.3d at 532–34. The North Dakota law also lacked the particular exceptions provided by Pennsylvania, but we held that North Dakota's medical-emergency exception allowed it to pass constitutional muster. *Id.* at 533. Because South Dakota's mandatory-information provision and medical-emergency exception are virtually identical to those we upheld in *Schafer,* Planned Parenthood's argument that they are unconstitutional must fail. Planned Parenthood argues that *Schafer* was wrongly decided, but, as we explained to counsel at the oral argument, this panel is bound by *Schafer.* Under our long-standing practice, only the en banc Court can overrule a prior panel opinion.

### VI.

■ Planned Parenthood also argues that the constitutional portions of South Dakota's Act to Regulate the Performance of Abortion are inextricably intertwined with the unconstitutional penalty provisions. It contends that the prohibition of conduct and the penalties for violating that prohibition are mutually dependent; one cannot stand without the other, despite the Act's severability provision. In short, it argues that if the civil and criminal penalties are unconstitutional, then the entire Act must be struck.

We do not believe that our holding that the criminal and civil penalties are unconstitutional invalidates the entire Act. South Dakota can enforce the constitutional portions of the Act under its pre-existing law. S.D.C.L. § 36–4–30, for example, allows the State to cancel, revoke, or suspend the license of a physician who engages in conduct "unbecoming a person's license to practice medicine." S.D.C.L. § 36–4–30(22). As an intentional violation of the abortion law would presumably be conduct unbecoming to a license to practice medicine, the State can enforce the remaining portions of the Act to Regulate the Performance of Abortion by revoking the medical license of any practitioner who willfully violates them. We therefore decline to strike the Act in its entirety.

## VII.

We hold that S.D.C.L. § 34–23A–7, the parental-notice provision of the Act to Regulate the Performance of Abortion, is unconstitutional on its face because it unduly burdens the liberty interests of a large number of mature minors and of immature minors whose best interests would be served by allowing an abortion without parental notification. We also conclude §§ 34–23A–10.2 and 34–23A–22, the criminal- and civil-penalty provisions of the Act, are unconstitutional because their strict liability chills the willingness of physicians to provide abortions in the state, and thus unduly burdens the right to have a pre-viability abortion. Finally, we uphold Section 34–23A–10.1, the mandatory-information provision, under the authority of *Fargo Women's Health Organization v. Schafer,* 18 F.3d 526 (8th Cir.1994).

The judgment is affirmed.