# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3093

_____

| | | |
|---|---|---|
| Planned Parenthood Minnesota, North Dakota, South Dakota; Carol E. Ball, M.D., | * * * * | |
| Plaintiffs - Appellees, | * * | |
| v. | * * | |
| Mike Rounds, Governor, in his official capacity; Larry Long, Attorney General, in his official capacity, | * * * * * | Appeal from the United States District Court for the District of South Dakota. |
| Defendants - Appellants, | * * | |
| Alpha Center; Black Hills Crisis Pregnancy Center, doing business as Carenet; Dr. Glenn A. Ridder, M.D.; Eleanor D. Larsen, M.A., LSWA, | * * * * * | |
| Intervenors on Appeal. | * | |

_____

Submitted: April 20, 2006
Filed: October 30, 2006

_____

Before MURPHY, MELLOY, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Planned Parenthood of Minnesota, North Dakota, South Dakota and its medical director Dr. Carol E. Ball (collectively Planned Parenthood) brought this action under the First and Fourteenth Amendments against Governor Mike Rounds and Attorney General Larry Long (state officials) to enjoin enforcement of measures enacted in 2005 revising the South Dakota law on informed consent to abortion. The district court[1] granted a preliminary injunction enjoining the new law from going into effect, and the state officials appeal.[2] Because we conclude that the plaintiffs showed a likelihood of prevailing on their constitutional arguments and that the district court did not abuse its discretion in granting injunctive relief at this preliminary stage of the proceedings, we affirm.

**I.**

In 1993 South Dakota enacted a law providing that no abortion can be performed without the patient's voluntary and informed consent unless it is impossible to obtain such consent due to a medical emergency. S.D.C.L. § 34-23A-10.1 (2003). Under this statute, the patient's consent will be informed only if certain information has been given to her at least 24 hours before an abortion procedure. The information required by the 1993 law includes the name of the physician who will perform the abortion, the medical risks associated with abortion and with carrying her child to term, and the probable gestational age of the embryo or fetus she is carrying. The patient must also have been told that medical assistance benefits may be available, that the father may be liable for support if she has her child, and that she has the right to view complimentary printed materials with pictures and drawings of embryos and

---

[1]The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota.

[2]The state officials shared their oral argument time with crisis pregnancy centers Alpha Center and Black Hills Crisis Pregnancy Center and their staff members, all of whom were granted leave to intervene after this appeal was filed.

fetuses at various gestational ages.  Id.  After the patient has received all of this information, she must sign an informed consent certification.  Id.  A provider's failure to comply with the state's informed consent requirements is a class 2 misdemeanor.  S.D.C.L. § 34-23A-10.2 (2005).[3]  We upheld the constitutionality of this 1993 law in Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1467 (8th Cir. 1995).

In 2005 South Dakota enacted House Bill 1166 (the Act) which is the subject of this action.  The Act amended the 1993 version of § 33-23A-10.1 and expanded the disclosure requirements for informed consent to abortion.  The disclosures required under the new law are contained in § 7 of the Act.  Under § 7, a woman contemplating abortion must receive oral disclosures from the physician scheduled to perform the abortion or a designee 24 hours in advance of the procedure and other written disclosures must be given by the physician no less than 2 hours before the procedure.  The mandatory disclosures include all of the information required under the prior law as well as the new provisions.

As part of the new disclosures required under § 7, the doctor's written statement provided 2 hours before an abortion must inform the patient:

> (b) That the abortion will terminate the life of a whole, separate, unique, living  human being;
>
> (c) That [the patient] has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota;
>
> (d) That by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated . . . .

---

[3]A class 2 misdemeanor is punishable by up to 30 days imprisonment and/or a $500 fine; restitution may also be ordered.  S.D.C.L. § 22-6-2.

S.D.C.L. § 34-23A-10.1(1)(b)–(d)(2005). Section 8 of the Act defines "human being" as an "individual living member of the species Homo sapiens." Although this definition is not part of the written statements required by § 7, the state officials suggest that a physician could choose to include it.

Other new disclosures mandated by § 7 of the Act include more specific information about the psychological risks of abortion, including depression, suicide, and suicidal ideation, to be given as part of the written statements 2 hours before the procedure. See S.D.C.L. § 34-23A-10.1(1)(e) (2005). The name, address, and telephone number of a nearby crisis pregnancy center must also be provided with the other oral disclosures 24 hours in advance. After the patient has read the written portion of the required disclosures, § 7 requires that she sign each page of the statement verifying that she has understood all the disclosures. S.D.C.L. § 34-23A-10.1(1) ¶ 2 (2005). If she asks for clarification or explanation about any required disclosure or has any other significant question, the physician's response must also be in writing. Id. That response becomes part of the patient's permanent medical record. Once all of the required disclosures have been provided, § 7 requires that the physician certify that she is satisfied that the patient "understands the information imparted." S.D.C.L. § 34-23A-10.1(2) (2005).

Section 10 of the 2005 Act provides that the 1993 informed consent requirements shall remain in effect if the provisions of § 7 are enjoined, suspended, or delayed. Section 11 provides that if any part of § 7 is found unconstitutional, it shall be severed from the remaining valid provisions of the Act.

Before the Act was to go into effect on July 1, 2005, Planned Parenthood brought this action and moved for a preliminary injunction. Planned Parenthood argued that requiring physicians to state in writing to their patients that abortion "terminates the life of a whole, separate, unique, living human being" violates the First and Fourteenth Amendment rights of both doctors and women, as do the two related

-4-

required written statements about the patient's "existing relationship" with that unborn human being and the potential termination of that relationship. Planned Parenthood argued that the constitutional injuries were reinforced by the physician's obligation to certify that the patient has not only received these messages but also understood them.[4] In its opposition to the motion, the state officials characterized these three challenged disclosures as statements of medical and scientific fact which are necessary to give complete and accurate information to women contemplating abortion.

The district court evaluated the request for injunctive relief under the four Dataphase factors: 1) the probability of success on the merits; 2) the threat of irreparable harm to the movant; 3) the balance between this harm and the injury which will result from granting the injunction; and 4) whether issuance of the injunction was in the public interest. Dataphase Sys., Inc. v. C L Sys. Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

The district court found that the challenged disclosures express the state's ideology on an "unsettled medical, philosophical, theological, and scientific issue." Planned Parenthood of South Dakota v. Rounds, 375 F. Supp. 2d 881, 887 (D.S.D. 2005) (citing Roe v. Wade, 410 U.S. 113 (1973)). The court concluded that the requirement that physicians give these messages likely violates their First Amendment rights against compelled speech and that Planned Parenthood had shown that it was likely to succeed on the merits. The court further determined that Planned Parenthood had demonstrated a threat of irreparable harm and that the balance of the harms and the public interest were also in its favor. It accordingly granted preliminary injunctive

---

[4]Planned Parenthood also argued that the new disclosure requirements in § 7 regarding the psychological risks of abortion and information about nearby crisis pregnancy centers are unconstitutionally vague and that the requirement for obtaining informed consent, unless a medical emergency makes it "impossible," unconstitutionally endangers the life and health of pregnant women. The district court did not discuss these arguments.

relief, enjoining the new provisions in § 7 of the Act but providing that the prior informed consent law remain in effect during the pendency of the preliminary injunction pursuant to § 10 of the Act.

## II.

On appeal the state officials and the intervenors (collectively South Dakota) argue that the district court erred in granting preliminary injunctive relief and alternatively that the court should have enjoined only those provisions of § 7 which it specifically found likely to be constitutionally infirm. We review a decision to grant preliminary injunctive relief with the assistance of the Dataphase factors, United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1178-79 (8th Cir. 1998). We will reverse if there was an abuse of discretion. Coca-Cola Co. v. Purdy, 382 F.3d 774, 782 (8th Cir. 2004). An abuse of discretion occurs if the decision of the district court is based on clearly erroneous factual findings or erroneous legal conclusions. Lankford v. Sherman, 451 F.3d 496, 503-04 (8th Cir. 2006).

## A.

The best starting point for our Dataphase analysis is consideration of the plaintiffs' likelihood of success on the merits. Cf. Clorox, 140 F.3d at 1179. This test is not one of mathematical probability, but rather a question of whether Planned Parenthood has a "fair chance of prevailing" after discovery and a full trial. Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 690 (8th Cir. 2003). We will uphold a preliminary injunction "if the underlying constitutional issue is close." Planned Parenthood of the St. Louis Region, Inc. v. Nixon, 428 F.3d 1139, 1145 (8th Cir. 2005) (internal quotations omitted).

Statutes regulating informed consent to abortion can implicate both a woman's fundamental due process right to have access to the procedure free from any undue

burden as well as her doctor's First Amendment right against compelled speech. Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 881-84 (1992) (plurality opinion). South Dakota argues that the preliminary injunction was based on erroneous legal premises. Its primary contention is that the challenged disclosures are statements of medical and scientific fact, making the requirement that physicians give them consistent with Casey and the Supreme Court's compelled speech cases. Planned Parenthood responds that the district court correctly determined that the disclosures are not factual or scientific, but ideological in nature, and that the requirement that physicians give these written statements likely violates the First Amendment.

The right to free speech encompasses both the right to speak or write freely and the right not to do so under some circumstances. Wooley v. Maynard, 430 U.S. 705, 714 (1977). To determine whether a particular speech requirement violates the right to refrain from speaking, a court must determine whether the requirement implicates First Amendment protections, id. at 714-15, and if it does, whether it is narrowly tailored to further a compelling state interest. Id. at 715-16; Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Ca., 475 U.S. 1, 19 (1986) (plurality opinion).

Governmentally compelled expression is particularly problematic when a speaker is required by the state to impart a political or ideological message contrary to the individual's own views. Cf. Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 410-11 (2000) (Thomas, J., dissenting) (finding it is "unassailable" that "[p]olitical speech is the primary object of First Amendment protection."); Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 797 (1988) (treating compelled speech and compelled silence as constitutionally equivalent). The Court determined in Wooley that a law prohibiting New Hampshire residents from covering up the license plate motto "Live Free or Die" forced those who objected to the message to use their cars as "mobile billboards" for the state's viewpoint. 430 U.S. at 715. The state's proffered justifications – public safety and the preservation of communal values – were not

sufficiently compelling to justify the regulation.  Id. at 715-17.  The Court reached a similar result in Pacific Gas, where a California administrative order required a utility company to disseminate a hostile consumer newsletter with its billing statements.  475 U.S. at 12-18.  Although the state's interest in fair and effective utility regulation may have been compelling, the Court concluded that it had other regulatory alternatives which would not have violated the First Amendment.  Id. at 19-20.

The Casey Court did not except informed consent to abortion statutes from normal First Amendment compelled speech protections, see 505 U.S. at 884, but it did resolve the constitutional balance of interests somewhat differently for state laws requiring disclosure of truthful, nonmisleading factual information to women contemplating abortion than in its balancing in Wooley and Pacific Gas.  See 505 U.S. at 882.  The Court concluded that the Constitution permits "information about the nature of the procedure, the attendant health risks and those of childbirth, and the 'probable gestational age' of the fetus."  Id.  Although disclosure requirements may implicate serious moral and political issues for physicians, they are permissible under the First Amendment if they are part of the state's "reasonable licensing and regulation" of the practice of medicine.  Id. at 884.  Under Casey, South Dakota may require that prolife messages be made available to women who want to receive them, just as it could require prochoice messages if it wished.  See id. at 882-83. Since the law at issue in Casey required doctors only to disclose the fact that printed materials were available rather than requiring them to deliver ideological messages themselves, the Court did not need to confront Justice O'Connor's concern in City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416 (1983), that "informed consent provisions may ... violate the First Amendment rights of the physician if the State requires him or her to communicate its ideology."  See id. at 472 n.16 (O'Connor, J., dissenting) (citing Wooley, 430 U.S. at 705).  In no case has the Court extended the bounds of permissible regulation to laws which force unwilling speakers themselves to express a particular ideological viewpoint about abortion.

South Dakota argues that the challenged disclosures are not ideological, but are supported by an objective scientific and medical consensus because of the Act's definition of a "human being" in § 8, as a "living member of the species Homo sapiens."  Although that may be one definition, the term human being is also likely to have much broader meaning for both physicians and patients.  See e.g., NTC's Compact English Dictionary 220 (2000) ("**human being** *n.* a person; a human creature"); The American Heritage Student Dictionary 720 (1994) ("**human being** *n.* A person; a woman, man, or child").  South Dakota cites no persuasive authority which supports its theory that the district court was bound by the legislature's definition of human being.  Under Casey's teaching, the district court was required to make a preliminary determination about the objective scientific and medical accuracy of the statements in the required disclosures.  505 U.S. at 882, 884.  This inquiry would be foreclosed if the legislature had the right to define the most important term in any way it desired, no matter how misleading.  Had the legislature wished to inform women contemplating abortion that a human fetus or embryo is a member of the species Homo sapiens, it could have drafted § 7 accordingly instead of referring to a "whole, separate, unique, living human being."  S.D.C.L. § 34-23A-10.1(1)(b).  It did not do so, however, and our task is to evaluate the message South Dakota would actually compel doctors to give in the disclosures.

The district court's assessment that the challenged disclosures express a value judgment rather than medical facts has evidentiary support in the record.  Planned Parenthood submitted declarations by Dr. Carol Ball, the other named plaintiff, who averred that the challenged disclosures contain statements of "ideology and opinion, not medicine and fact," and by Dr. Paul Root Wolpe, a University of Pennsylvania bioethicist, who stated that the disclosures were supported by "no scientific or medical consensus."  South Dakota alleges deficiencies in each declaration, including the affiliation of both declarants with Planned Parenthood and the fact that Wolpe is a bioethicist rather than a medical doctor.  At this preliminary stage, however, we review factual determinations based on the record for clear error only, Purdy, 382 F.3d

at 782, since "a party ... is not required to prove his case in full."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  The Wolpe and Ball declarations provide sufficient evidentiary support for the district court's findings.

The district court's factual determination about the character of the challenged disclosures is also supported by the Supreme Court's reasoning in Roe, Akron, and Casey.  In our review of trial court factual determinations, we have distinguished between adjudicatory and legislative factfinding.  Qualley v. Clo-Tex Int'l, Inc., 212 F.3d 1123, 1128 (8th Cir. 2000).  Unlike adjudicatory factfinding, legislative factfinding relates to facts which do not vary based on the activities or characteristics of particular litigants.  Id.; see also A Woman's Choice-East Side Women's Clinic v. Newman, 305 F.3d 684, 689 (7th Cir. 2002).  Once resolved by an appellate court, issues of legislative fact need not be relitigated in lower courts each time they arise anew.  See Carhart v. Gonzales, 413 F.3d 791, 800-01 (8th Cir. 2005) (whether substantial medical authority supports a need for a health exception to a late term abortion ban was a question of legislative fact addressed by the Supreme Court in Stenberg v. Carhart, 530 U.S. 914 (2000)); Newman, 305 F.3d at 689 (same).

The district court was entitled to determine at this stage that whether a fetus or embryo is a "whole, separate, unique, living human being" as a matter of objective science is a question of legislative fact already addressed by the Supreme Court.  The Court held in Roe that the state of Texas had no compelling interest in forbidding abortion from the moment of conception.  410 U.S. at 159.  The factual underpinning for this holding was the Court's finding that there was no medical, scientific, or moral consensus about when life begins, making the question of when a fetus or embryo becomes a human being one of individual conscience and belief.  Id. at 159-63.  The Court later relied on this assessment in Akron to strike down part of an informed consent law which compelled abortion providers to tell their patients that "the unborn child is a human life from the moment of conception."  462 U.S. at 444.  The Akron majority reasoned that under Roe, states could not "adopt one theory of when life

-10-

begins to justify ... regulation of abortions." Id. (citing Roe, 410 U.S. at 159-62). To the extent that Akron interpreted Roe to bar enactment of any informed consent requirement intended to promote childbirth in order to protect "potential life," it was overruled by Casey. 505 U.S. at 876. The Court gave no indication in Casey, however, that it was repudiating its view about the lack of a medical, scientific, or moral consensus as to when human life begins. Cf. id. at 852 ( "*some* deem [abortion to be] nothing short of an act of violence against innocent human life")(emphasis added). And because the Supreme Court did not repudiate its position, it is not for us to do so. See Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) (courts of appeals should leave it to the Supreme Court expressly to overrule its own decisions).

Legislative factfinding in this case implicates mixed questions of constitutional law and fact. Cf. Carhart, 413 F.3d at 797-98; Newman, 305 F.3d at 689. At this stage we do not evaluate whether the lower court's constitutional conclusions were correct so long as the underlying question was close. Nixon, 428 F.3d at 1145. Even if the court's reasoning was correct based on the evidence before it when it decided the motion for a preliminary injunction, the parties have continued to develop the record in the district court, giving South Dakota the opportunity to try to establish that its terminology is supported by a firm medical consensus due to new scientific and technological developments. See Casey, 505 U.S. at 860 (relying on advances in neonatal care to declare Roe's trimester framework obsolete). Since the district court's determination about the ideological nature of the challenged disclosures was not clearly erroneous, however, it was entitled to hold that requiring doctors both to give these disclosures in writing to patients and certify that the patients "understand" them is likely to constitute compelled speech in violation of the First Amendment. See Wooley, 430 U.S. at 715.

South Dakota argues that even if these challenged disclosure requirements do constitute compelled speech, they are justified under the second part of the Wooley

test by its compelling state interests in protecting fetal life and maternal psychological health. Id. at 715-16. Planned Parenthood responds that South Dakota's interests could be protected by less burdensome requirements. Even if the protection of potential fetal life and maternal health are compelling interests, see Casey, 505 U.S. at 871, 882, South Dakota has not shown that the challenged disclosure requirements are the least burdensome means at its disposal. Cf. Pacific Gas, 475 U.S. at 19-20. The district court was not obligated to find the disclosures to be justified by compelling state interests.

South Dakota finally contends that even if these challenged disclosure requirements likely were in facial violation of the First Amendment, the district court still erred in granting preliminary injunctive relief because § 7 of the Act could be construed to permit physicians to disassociate themselves from the ideological message they are required to convey. Planned Parenthood counters that if there were such a disassociation right in the Act, it would not remedy the constitutional injury.

The 2005 Act makes no mention of any right of a physician to disassociate herself from the statements she is required to give the patient, and it is questionable that one may be inferred under a statute which makes a provider's failure to comply with its terms a criminal act. S.D.C.L. § 34-23A-10.2. Where the meaning of a state statute is unclear, federal courts should avoid granting or denying preliminary injunctive relief based on a construction urged by one of the parties and instead consider the statutory ambiguity itself as a factor. Nixon, 428 F.3d at 1144. Moreover, any such disassociation right would be chilled by the requirements that the physician certify in writing both that the compelled statements were made and that they were understood by the patient. These requirements would likely diminish both the ability of a physician to disassociate herself and the effect of any communication of her own views.

-12-

In any event, whether § 7 of the Act could be interpreted to permit physicians to disassociate themselves from the challenged disclosures would appear to have little impact on Planned Parenthood's likelihood of success on the merits. A physician's right to disassociate herself from an informed consent to abortion disclosure becomes constitutionally relevant under Casey if the required information is misleading as applied to a specific patient, even though it is generally neutral and accurate. See Fargo Women's Health Org. v. Schafer, 18 F.3d 526, 533-34 (8th Cir. 1994). Where the required disclosure primarily conveys a subjective political, ideological, or moral viewpoint rather than medical facts, the issue becomes not the message itself, but the physician's right to control her own expression for "the choice to speak includes within it the choice of what not to say." Pac. Gas, 475 U.S. at 16. Even though the utility company in Pacific Gas was free to add materials with its billing statements to rebut the hostile assertions the company was forced to include, the Court found this type of "forced response" to be "antithetical to the free discussion that the First Amendment seeks to foster." Id. at 911-12. Similarly, the injury which results from forcing an abortion provider to recite the state's ideological objections to abortion would not be eliminated by simply allowing her to add her own views.

The new Act also circumscribes the exercise of physicians' medical judgment more than the statute examined in Casey. The physician's right to exercise medical judgment has been recognized since Roe, which "vindicate[d] the right of the physician to administer medical treatment according to his professional judgment" up until the point of viability. Roe, 410 U.S. at 163. The statute challenged in Casey preserved a physician's ability to exercise medical judgment because it allowed a doctor to choose not to obtain informed consent if "he or she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient." Casey, 505 U.S. at 883-84. Under the South Dakota Act, a physician can proceed with an abortion without obtaining informed consent only if it would be impossible to obtain it. If a physician were reasonably to believe that providing the disclosures required by the Act would be detrimental to the

health and safety of a particular patient, she would be prevented from exercising her medical judgment to proceed without the advisories if it would be *possible* for her to obtain informed consent. This is counter to the law upheld in Casey. See id.

Planned Parenthood additionally argues that the required disclosures likely violate the rights of women seeking abortion because the disclosures are misleading and patients are forced to listen to the state's ideological message. South Dakota suggests that Planned Parenthood lacks standing to assert these claims because the interests of abortion providers do not align with those of their patients. It also repeats its assertion that the disclosures contain nothing but neutral facts.

Although ordinarily one may not claim standing to assert the rights of a third party, the Supreme Court has carved out an exception for physicians asserting their patients' right to have access to abortion. Singleton v. Wulff, 428 U.S. 106, 114-18 (1976). Singleton did not adopt a per se rule, id. at 118 n.7, but the Court has never held since then that a physician lacks standing in this context. The test is not whether interests are perfectly aligned, but whether the plaintiff physician will "adequately represent" the absent woman's constitutional rights. Okpalobi v. Foster, 190 F.3d 337, 353 (5th Cir. 1999). We conclude that Planned Parenthood has standing here to assert the liberty interest of its patients.

States may not enact regulations which unduly burden a woman's right to terminate her pregnancy before viability of the fetus by placing a substantial obstacle in her path. Casey, 505 U.S. at 876-77. The required disclosure of truthful, nonmisleading factual information does not pose a substantial obstacle, whether or not the purpose is to advocate childbirth. Id. at 882-83. That remains true even if the provision of information causes some incidental delay and inconvenience. See id. at 874; Schafer, 18 F.3d at 533. It is entirely appropriate for a state to mandate that certain information be provided to women contemplating abortion in order to protect both potential life and maternal health by ensuring that the decision about whether to

abort is "mature and informed." <u>Casey</u>, 505 U.S. at 883. However, "the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." <u>Id.</u> at 877. Disclosure requirements which hinder a woman's free and informed choice rather than assist it would violate <u>Casey</u>.

We have been unable to find any case in which a federal appellate court has considered disclosure requirements at all similar to those challenged here. Those upheld since <u>Casey</u> concerned disclosure requirements which provided factual information to women contemplating abortion. <u>See</u> <u>Karlin v. Foust</u>, 188 F.3d 446 (7th Cir. 1999); <u>Fargo Women's Health Org. v. Schafer</u>, 18 F.3d 526 (8th Cir. 1994); <u>Barnes v. Moore</u>, 970 F.2d 12 (5th Cir. 1992). Here, in contrast, before a woman seeking an abortion may obtain access to a medical procedure, she is required to receive extensive information about the state's viewpoints about the procedure. Her physician must also certify page by page that the patient has understood those viewpoints and all the other information required by the state. As South Dakota points out, a woman considering abortion is likely to be in a state of heightened emotion and vulnerability. Forcing her not only to read, but to sign each page of a statement containing the state's moral and philosophical objections to the procedure she has planned and intends to undergo, and forcing her doctor to certify that she "understands" these objections, does little to promote independent decision making and may actually exacerbate any adverse psychological consequences of the procedure. Such disclosure requirements are far more onerous than what federal courts have previously reviewed, and there is at least a "fair chance" that they pose an undue burden. <u>Waddle</u>, 335 F.3d at 690.

Because the challenged disclosures could be found to violate both the First Amendment rights of physicians and the due process rights of women seeking abortion, we conclude that the district court did not abuse its discretion in holding at

this preliminary stage that Planned Parenthood demonstrated a likelihood of success on the merits.

**B.**

Although likelihood of success is likely the most critical <u>Dataphase</u> factor, the others must also be considered. <u>Kirkeby v. Furness</u>, 52 F.3d 772, 775 (8th Cir. 1995). We next turn to the threat of irreparable harm. South Dakota argues that the district court erred in finding a threat of irreparable harm, asserting that the Act is constitutional. Planned Parenthood counters that the challenged provisions are constitutionally suspect and that any violation of First Amendment rights constitutes irreparable harm.

We have previously recognized that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Kirkeby</u>, 52 F.3d at 775. <u>Kirkeby</u> involved the First Amendment right of abortion opponents to picket the residences of providing physicians, and we concluded that the plaintiffs had a strong interest protected by the First Amendment. <u>Id.</u> The interest abortion providers have in expressing their own personal views on abortion is likely no less than that of their opponents. In light of its reasonable determination at this stage that the challenged disclosures express a primarily subjective ideological viewpoint, the district court did not abuse its discretion in concluding that the plaintiffs here also demonstrated a threat of irreparable harm.

We next consider the balance of the harms. South Dakota argues that issuance of the preliminary injunction poses significant risk of harm to pregnant women, citing not only the constitutional interest such women have in making informed medical decisions for themselves, <u>Casey</u>, 505 U.S. at 882, but also the interests they have in their familial relationships and in making decisions for their children. <u>See</u>, <u>e.g.</u>, <u>Troxel v. Granville</u>, 530 U.S. 57, 74 (2000); <u>Smith v. Org. of Foster Families</u>, 431

-16-

U.S. 816, 845 (1977). Planned Parenthood responds that the district court reasonably balanced the harms, since South Dakota's prior "robust" informed consent law was left in place.

In the course of its opinion the district court considered the First Amendment rights of physicians as well as the rights of women not to be unduly burdened by state imposed obstacles to abortion, and those interests are appropriately weighed with those of South Dakota in the balance of harms. Since violations of the Act may subject abortion providers to criminal penalties, there is added potential harm for "[c]onstitutional concerns are greatest when the State attempts to impose its will by [such] force of law . . . ." Maher v. Roe, 432 U.S. 464, 475 (1977).

South Dakota has not shown that the prior informed consent law fails to give adequate protection to the interests of pregnant women during the pendency of the temporary injunction. The 1993 law which remains in effect requires a woman contemplating abortion to be told not only about the potential health risks associated with abortion, but also about the probable gestational age of her unborn child and many of the rights and obligations which will accompany that child's birth. It is highly improbable that after such disclosures, a patient would still be under the impression that the fetus or embryo she carried was "just tissue," as one witness before the South Dakota legislature said she had been told about her own abortion. In fact, none of the women whose legislative testimony and declarations in the record indicate they were misinformed before their abortions had the benefit of the 1993 law. Their abortions had taken place either before passage of the 1993 statute or in other states. Moreover, there is no evidence in the record to indicate that Planned Parenthood, currently the only abortion provider in South Dakota, has sought to mislead or otherwise coerce women into violating their beliefs by having abortions. The district court did not abuse its discretion in balancing the harms.

Finally, the public interest must be considered. South Dakota argues that it would be better served by allowing the Act to go into effect, "thereby protecting women contemplating abortions, as well as their unborn children." Planned Parenthood responds that the public interest is served by the legislature acting within its constitutional limits.

The right to control one's expressive communication is "at the core of the First Amendment," Olmer v. City of Lincoln, 192 F.3d 1176, 1180 (8th Cir. 1999), and the public interest is served by "free expression on issues of public concern" like abortion. Kirkeby, 52 F.3d at 775. Accordingly, we have previously required or upheld preliminary injunctive relief against laws which burdened the expressive rights of those opposed to legal abortion who have sought to take their message to places where legitimate concerns about public safety and privacy might otherwise have justified its exclusion. Kirkeby, 52 F.3d at 776; see also Olmer, 192 F.3d at 1180 (First Amendment right to picket churches). The need for First Amendment protection is no less apparent with respect to abortion providers, and the 1993 law continues to ensure that women considering abortion will receive much of the state's desired disclosures. We conclude there was no abuse of discretion with respect to this final Dataphase factor.

## C.

South Dakota finally argues that the district court erred in enjoining all of the new provisions in § 7 of the Act. It contends that the district court should have enjoined only the challenged disclosures discussed in its opinion and that the severability provision in § 11 should control. Planned Parenthood counters that the district court properly complied with § 10 of the Act which provides that if provisions of § 7 are enjoined, the prior informed consent law remains in effect in its entirety.

-18-

Section 11 of the Act states that "if any court of law finds any provisions of section 7 of this Act to be unconstitutional, the other provisions of section 7 are severable." S.D.L. ch. 186, § 11. The precondition for severability has not been met in this case, for no court has found any provision of the Act to be unconstitutional. At this point only a temporary injunction has been put in place while the case is being further developed in the district court before a ruling on the merits can issue. The circumstances at this juncture are very different from those in Ayotte v. Planned Parenthood of N. New England, 126 S. Ct. 961 (2006), where a statute was permanently enjoined. Here South Dakota's general legislative policy on informed consent in the form of its 1993 law remains in effect during the pendency of the temporary injunction.

The present situation actually fits squarely under § 10 of the Act. Section 10 states that the prior informed consent law will remain in effect "if any court of law enjoins, suspends, or delays the implementation of the provisions of section 7 of this Act." Id. § 10. Section 10 contains no severability provision, and it was not for the district court to imply one by picking and choosing which provisions of the Act should be allowed to go into effect prior to a final judgment. See Café Erotica of Florida, Inc. v. St. John's County, 360 F.3d 1274, 1292 (11th Cir. 2004) ("The interests of federalism and comity dictate conservatism to federal courts in imposing their interpretive views on state statutes."). The dissent's contention that § 10 is only relevant if a court were to enjoin *all* of the provisions in § 7 is not persuasive. Its argument rests on reading the word "all" into the text of the statute, a word which was not used by the South Dakota legislature. We conclude that the district court gave effect to § 10 by following its mandate to keep the 1993 statute effective until this case is resolved.

**D.**

We conclude for these reasons that the district court did not abuse its discretion, and we thus affirm its temporary injunction.

GRUENDER, Circuit Judge, dissenting.

I would hold that the provisions of § 7 of the Act fall within the bounds of constitutionality, as defined by <u>Casey</u>, for informed consent provisions in the abortion context. Accordingly, I would hold that Planned Parenthood's challenge to the Act cannot succeed on the merits and that the preliminary injunction should be vacated in its entirety. In any event, I would hold that only the unconstitutional provisions of the Act, if any, should be enjoined. Therefore, I respectfully dissent.

In my view, the proper approach to this issue requires a provision-by-provision analysis of each disclosure provision of § 7 of the Act. Under such an approach, most of the Act easily passes constitutional muster under established precedent. The only provision that the Court addresses in depth, § 7(1)(b), initially appears to present a closer question, given its provocative use of the term "human being." However, upon examination of the disclosures actually required by § 7(1)(b), I would hold that the district court also erred when it enjoined that subsection.

The first issue to be addressed is the proper scope of any preliminary injunction. Next, I proceed to the legal standards for evaluating informed consent provisions in the abortion context and, finally, to an evaluation of each provision of § 7 under those standards.

## I.    Proper Scope of an Injunction

The first question to be resolved is whether an injunction as to one of the challenged provisions necessitates an injunction as to all of the Act's provisions, even those that are likely constitutional or were not even challenged by Planned Parenthood.  The district court enjoined the entire Act based upon its finding that some provisions were potentially constitutionally infirm, and the Court affirms that approach based on the language of § 10.  However, I find that the plain language of § 10 does not support the Court's reasoning.  See Watson v. Ray, 192 F.3d 1153, 1155 (8th Cir. 1999) ("When determining the meaning of a statute, our starting point must be the plain language of the statute.").

The Act contains the following provisions regarding court action (emphases added):

> Section 10.  If any court of law enjoins, suspends, or delays the implementation of *the provisions* of section 7 of this Act, the provisions of [the previous version of the statute] are effective during such injunction, suspension, or delayed implementation.

> Section 11.  If any court of law finds *any provisions* of section 7 of this Act to be unconstitutional, the other provisions of section 7 are severable.  If any court of law finds *the provisions* of section 7 of this Act to be entirely or substantially unconstitutional, the provisions of [the previous version of the statute] are immediately reeffective.

Although I agree with the Court that § 11 does not apply at this stage of the proceedings, I note that its structure demonstrates a marked contrast with § 10.  Section 11 considers two potential actions:  a court finding that "any provisions" of § 7 are unconstitutional, in which case the remaining provisions are preserved, and a court finding that "the provisions" of § 7 are entirely unconstitutional, in which case the former version of the statute is reinstated.  On the other hand, § 10 considers only

-21-

one potential action: a court finding that enjoins "the provisions" of § 7, in which case the former version of the statute is reinstated.

Despite the legislature's use in § 10 of only the plural with a definite article ("the provisions"), the Court reads § 10 as though it says "any provision" and therefore concludes that "[t]he present situation actually fits squarely under § 10 of the Act." Ante at 19. In my view, because § 10 contains only the all-inclusive phrase "the provisions" instead of addressing "any provision," the Court's reading is incorrect. Courts have recognized that the use of the plural is an integral part of a statute's construction. Thus, for example, we have previously concluded that the phrase "civil rights" inherently refers to "a cluster of rights" rather than a single right. United States v. Keeney, 241 F.3d 1040, 1044 (8th Cir. 2001). We are not alone in our approach to this canon of statutory construction. See, e.g., Metro. Stevedore Co. v. Rambo, 515 U.S. 291, 296 (1995) ("The use of 'conditions,' a word in the plural, suggests that Congress did not intend to limit the bases for modifying awards to a single condition . . . .") (quoting 2A, Norman J. Singer, Sutherland on Statutory Construction § 47.34 (5th ed. 1992) ("Ordinarily the legislature by use of a plural term intends to reference more than one matter or thing . . . .")).[5]

Because § 10 does not expressly address the steps to be taken if a court enjoins fewer than all "the provisions" of § 10, I believe the Court makes a mistake in reasoning that "it was not for the district court to imply [a severability provision] by picking and choosing which provisions of the Act should be allowed to go into effect prior to a final judgment." Ante at 19. The Supreme Court recently held the opposite in Ayotte v. Planned Parenthood of N. New England, 126 S. Ct. 961 (2006). In

---

[5]Nor, in my view, would the former version of the statute be reinstated simply because more than one, but not all, provisions of Section 7 were enjoined. If this were the case, the legislature would have simply said, "If any court of law enjoins, suspends, or delays the implementation of *provisions* of section 7" or "*any* provisions of section 7," rather than "*the* provisions of section 7" as actually stated.

<u>Ayotte</u>, the Supreme Court reviewed a district court's decision (affirmed by the First Circuit) to permanently enjoin an entire parental consent law because the law lacked an exception that would allow a minor to receive an abortion without consent in the case of a medical emergency. <u>Id.</u> at 965. Although the district court and First Circuit enjoined the entire law, the Supreme Court vacated the judgment, holding "that invalidating the statute entirely is not always necessary or justified, for lower courts may be able to render narrower declaratory and injunctive relief." <u>Id.</u> at 964.

The Supreme Court reasoned that "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." <u>Id.</u> at 967 (internal citations omitted). The legislature's intent is at the crux of the test to be applied. "After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?" <u>Id.</u> at 968. The Supreme Court resolved the issue presented in <u>Ayotte</u> by remanding for a determination of whether the New Hampshire legislature would have preferred that only the unconstitutional provisions be enjoined. The Supreme Court clearly thought that such a remedy was possible, as "[o]nly a few applications of New Hampshire's parental notification statute would present a constitutional problem." <u>Id.</u> at 969.

As in <u>Ayotte</u>,[6] there is no reason in the instant case for the district court to adopt "the most blunt remedy" where the parties ask for "relief more finely drawn." <u>Id.</u> "Severability is of course a matter of state law." <u>Leavitt v. Jane L.</u>, 518 U.S. 137, 139 (1996) (per curiam). Under South Dakota law, constitutional portions of a statute are severable at the preliminary injunction stage if (1) they can stand by themselves after the unconstitutional clauses are struck, and (2) it appears the state legislature would have intended the constitutional portions to take effect without the invalidated clauses. <u>Roberts v. Barnett</u>, 582 N.W.2d 386, 394 (S.D. 1998). The party arguing against severability has the burden of showing that the legislature would not have enacted the statute without the severed portion. <u>Id.</u> In the instant case, if less than all of the provisions of § 7 are found to necessitate an injunction, the record is clear that the South Dakota legislature would prefer that only the unconstitutional provisions of § 7 be enjoined. Section 11, which establishes the severability of provisions not held

_____

[6]Although <u>Ayotte</u> dealt with a permanent injunction, I agree with the Sixth Circuit that <u>Ayotte</u>'s logic is applicable in the context of preliminary injunctions. <u>See</u> <u>Planned Parenthood Cincinnati Region v. Taft</u>, 444 F.3d 502, 516-17 (6th Cir. 2006) (relying on <u>Ayotte</u> to vacate in part a preliminary injunction of an entire statute and remanding to the district court to determine whether a narrower injunction would be sufficient). A preliminary injunction in a case such as the instant one may be in place for a period of years, and there is no reason to suppose that we should ignore <u>Ayotte</u>'s aversion to the needless thwarting of a legislature's work by an overly broad injunction during that period just because the period has an (as yet unknown) endpoint.

I also note that the case cited by the Court in enjoining the entire statute, <u>Café Erotica</u>, does not stand for the proposition that a court should necessarily enjoin the entirety of a statute on the basis of one suspect provision. The Eleventh Circuit recognized in <u>Café Erotica</u> that "Florida law requires [a court] to sever any provisions of the Ordinance that it finds unconstitutional, while allowing valid portions to stand, *but only if* problematic provisions can be distinguished and clearly separated," and held that severance would not save the statutory scheme it was reviewing. 360 F.3d at 1292 (internal quotation omitted).

to be unconstitutional on the final merits, shows the legislature's clear intent to preserve the constitutional provisions of § 7 wherever possible.

The very nature of the Act reinforces this conclusion. The legislature clearly believed that a patient's decision to consent was not fully informed unless all the information outlined in § 7 was provided to the patient. See § 7 ("A consent to an abortion is not voluntary and informed, unless . . . the physician provides that pregnant woman with the following information . . . ."). Thus, to conclude now that the State would prefer each and every provision to be enjoined should any of them be enjoined, one would have to find that the State preferred that none of the new information it considers indispensable, even information for which the court has found no likely constitutional infirmity, be given to the patient unless it all can be given. Nothing indicates to me that this was the case. Therefore, the entire Act should not have been enjoined based upon the Court's conclusion that one provision was properly enjoined. Ayotte, 126 S.Ct. at 968.[7]

---

[7]I note that the instant case in particular exemplifies the perverseness of the all-or-nothing approach to injunctions. Following oral argument in this matter, Planned Parenthood decided to abandon several of their arguments for enjoining certain provisions of the Act. See Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, No. 05-4077, 2006 WL 2092595, at *2 (D.S.D. July 26, 2006). Specifically, Planned Parenthood sought "leave to amend their complaint to abandon two specific causes of action," including their argument that the provision of the Act requiring the physician to provide a referral to a "pregnancy health center in the reasonable proximity of the abortion facility" was unconstitutionally vague and their argument that the provision requiring physicians to inform their patient of the risks of "depression and related psychological distress" is unconstitutionally false and misleading. Id. at *2-4 ("In short, plaintiffs move to amend their complaint to drop their challenge to the constitutionality of section 7(2)(c);" "Plaintiffs now seek to amend their complaint to withdraw their argument that section 7(1)(e)(i)'s mandatory disclosure of '[d]epression and related psychological distress' as a risk associated with abortion is unconstitutional.").

Having determined that only those individual provisions of the Act that merit a preliminary injunction, if any, should be enjoined, I now proceed to examine each disclosure provision of the Act.

## II.    Applicable Law for Evaluating the Likelihood of Success on the Merits

This appeal presents two distinct constitutional issues: (i) whether the Act's informed consent provisions constitute an undue burden upon the patients' substantive due process rights to obtain an abortion; and (ii) whether requiring physicians to obtain their patients' informed consent in the manner legislated by the Act violates the physicians' First Amendment right not to speak. Much of the law relevant to physicians' First Amendment rights in the context of informed consent to abortions is embedded within explanations of the undue burden standard in Casey. I begin by extracting the governing law, relying for the most part on Casey, and then proceed to apply that law to each provision of § 7.

### A.    The Undue Burden Standard

The well-known undue burden standard was enunciated by a three-justice joint opinion of the Supreme Court in Casey.[8] A statute or regulation is an undue burden

In other words, here, Planned Parenthood itself no longer contends that two key provisions of the Act are unconstitutional. Yet, under the Court's holding today, patients in South Dakota will not receive the information that those provisions required to be disclosed so long as trial of the entire matter is pending before the district court. This approach certainly does not serve the ends of "comity" as they are described by the Court. See ante at 19.

[8]We have adopted the standards enunciated by the Casey joint opinion as controlling precedent in abortion cases. Miller, 63 F.3d at 1456 n.7 (recognizing the joint opinion "as the Supreme Court's definitive statement of the constitutional law on abortion"); see also Stenberg, 530 U.S. at 930 (2000) (applying, in a majority opinion, the undue burden standard from the Casey joint opinion).

if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Casey, 505 U.S. at 877. Under this standard, not every burden upon a woman's exercise of her right to an abortion is an undue one. "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." Id. at 874. Stated another way, "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." Id. at 873. Instead, laws imposing undue burdens are those that in some "real sense deprived women of the ultimate decision." Id. at 875. And "under the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest." Id. at 886. In the context of informed consent, "[i]f the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible." Id. at 882.

Several cases illustrate the boundaries of the undue burden standard. In Stenberg, 530 U.S. at 930, the Supreme Court held unconstitutional a statute banning partial-birth abortions. First, the Court held that the statute was unconstitutional because of the absence of an exception for the preservation of the health of the mother, a requirement independent from the undue burden standard. Id. In addition, the Court held that the statute's broad language criminalized "the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment. The result is an undue burden upon a woman's right to make an abortion decision." Id. at 945-46. In Casey itself, a 24-hour waiting period was held not to be an undue burden, even though "the waiting period has the effect of increasing the cost and risk of delay of abortions." 505 U.S. at 886 (internal quotation omitted). However, a spousal notification provision created an undue burden because it was "likely to prevent a significant number of women [who fear for their safety and the safety of their children] from obtaining an abortion. It does not merely make

-27-

abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle." Id. at 893-94. In Miller, we found a parental-notification provision without an adequate bypass procedure created an undue burden because it would operate to prevent abortions even for mature minors or for minors who could demonstrate that an abortion was in their best interests, 63 F.3d at 1458, and even for some abused minors, id. at 1463.

From cases such as these, it is clear that a statute does not constitute an undue burden unless it in a "real sense deprive[s] women of the ultimate decision." Casey, 505 U.S. at 875. Planned Parenthood has cited no case where a provision merely requiring the disclosure of information prior to the procedure has been invalidated as an undue burden.

## B. Free Speech Rights of Physicians

The law governing compelled speech by physicians is relatively undeveloped. Nevertheless, four relevant principles can be derived from the case law, especially from Casey in the context of informed consent to abortion, and those principles should guide our analysis of the Act. First, as the Court noted, citizens have a right not to be compelled to speak under many circumstances. Ante at 7 (citing Wooley, 430 U.S. at 714).

Second, physicians enjoy a diminished right not to be compelled to speak in the context of practicing medicine, as that practice is subject to state licensing and regulation.

> Thus, a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional

-28-

purposes, no different from a requirement that a doctor give certain specific information about any medical procedure.

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. *To be sure, the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.*

Casey, 505 U.S. at 884 (internal citations omitted) (emphasis added). Thus, the State may require the physician to provide information the State deems necessary for informed consent to a medical procedure. The outer bounds of this relationship are not expressly defined. At a maximum, it may be that the State can direct the physician to provide any disclosure that is otherwise permissible under the undue burden standard. At a minimum, the State can, at the least, direct physicians to provide the type of information contained in the informed consent statute deemed acceptable in Casey.

Third, the State is permitted to voice its preference for childbirth, even before the fetus is independently viable. Casey, 505 U.S. at 846 (noting that one of Roe's "essential holding[s]" was that "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child"); see also id. at 869 ("The woman's liberty is not so unlimited . . . that from the outset the State cannot show its concern for the life of the unborn, and at a later point in fetal development the State's interest in life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted."); id. at 870 ("the State has a legitimate interest in promoting the life or potential life of the unborn").

This substantial state interest allows the state to inform its citizens about the "philosophic and social arguments" against abortion. As Casey held in the course of addressing Pennsylvania's informed consent law:

> Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. *Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy* to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself. *The Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth.*

505 U.S. at 872 (internal quotation omitted) (emphases added).

Not only did Casey emphasize in broad terms the State's right to voice its views, it also noted limitations on the patient's right not to listen. Thus, "[w]hat [was] at stake [in Casey was] the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so." Id. at 877. As such, "[r]egulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." Id. Ultimately, "a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal." Id. at 878.

Fourth, in furtherance of its interest in childbirth, the State can require the physician to provide even non-medical information as part of obtaining a patient's informed consent. In Casey, the Court approved a statute whereby the State required the physician to inform the patient that the father of her child would be liable for child

support and that other agencies and organizations would help the patient should she want an alternative to abortion. 505 U.S. at 881, 902-03. "In short, requiring that the woman be informed of . . . the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion." Id. at 883.

## III.    Application of Casey's Principles to the Disclosure Provisions of the Act

I begin by applying the principles set forth above to the provisions of the Act that were enjoined without extensive analysis by the district court.  These include

§ 7(1)(e) (the "medical advice provisions") and § 7(1)(c), (d) (the "legal advice provisions").  I then review § 7(1)(b), which was the primary focus of both the district court's order and the Court's opinion today.

### A.    The Medical Advice Provisions

Among the subsections enjoined by the district court are several provisions requiring the physician to provide certain medical advice.  The information that must be provided includes a "description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected."
§ 7(1)(e).  Among the risks delineated by the state legislature, the physician must provide the patient with information concerning "[d]epression and related psychological distress," "[i]ncreased risk of suicide ideation and suicide," "an accurate rate of deaths due to abortions, including all deaths in which the abortion procedure was a substantial contributing factor," and "[a]ll other known medical risks to the physical health of the woman, including the risk of infection, hemorrhage, danger to subsequent pregnancies, and infertility."  § 7(1)(e)(i)-(iv).  The physician must also disclose the "probable gestational age of the unborn child at the time the abortion is to be performed, and a scientifically accurate statement describing the development

-31-

of the unborn child at that age; and . . . [t]he statistically significant medical risks associated with carrying her child to term compared to undergoing an induced abortion." § 7(1)(f), (g).[9]

A state's right to require a physician to deliver the type of medical information outlined above is clearly established.  See, e.g., Casey, 505 U.S. at 881-82.  Casey expressly found that the mental health effects of abortion are a substantial and valid consideration in the context of abortion.  Id. at 882 ("It cannot be questioned that psychological well-being is a facet of health.").  There is no reason why informing a woman of the potential mental side-effects of abortion is not the proper subject for an informed consent dialogue.  The same is true of the risk of death, infection, hemorrhage and subsequent infertility.  And Casey itself approved the requirement that the gestational age be given to the patient.  Id. at 881.  I would conclude, therefore, that the medical advice provisions are permissible as a matter of law under well-established precedent and should not be enjoined.

### B.     The Legal Advice Provisions

The Act requires a physician to inform his or her patient that there are legal protections associated with her relationship with her unborn child and that terminating the pregnancy will terminate those protections.  See ante at 3-4 (reproducing § 7 (1)(c), (d)).  As outlined above, the State is empowered to require the provision of legal information, as well as medical information, that might be relevant to a woman's decision concerning whether or not to deliver her child.  There is no doubt that the relationship between a mother and her unborn child is a legally protected one.  "Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education."  Casey,

---

[9]We have already upheld the constitutionality of some of these provisions in the 1993 version of the statute.  See Miller, 63 F.3d at 1467.

505 U.S. at 851 (citing Carey v. Population Servs. Int'l, 431 U.S. 678, 685 (1977)). The right to carry a child to term under most circumstances is undisputed. See Casey, 505 U.S. at 859 (noting that Roe equally stands for the proposition that a State cannot "readily restrict a woman's right to choose to carry a pregnancy to term as to terminate it, to further asserted state interests in population control, or eugenics, for example").

The Act's requirement that the physician tell the patient in general terms about the existence of legal protections associated with the relationship she enjoys with her unborn child is no less relevant to informed consent than the requirement, upheld in Casey, that a physician inform his patient that she could obtain financial assistance from the child's father. Id. at 881. Information about the right to financial support from the father would mean little without knowledge of the right to carry the child to term, perhaps in the face of a father who is pressuring the patient to have the abortion. As such, I would conclude that the legal advice provisions are permissible under Casey and should not be enjoined.

## C.    Section 7(1)(b)

Section 7(1)(b) requires a disclosure "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being." In turn, § 8(4) of the Act defines "human being" as "an individual living member of the species Homo sapiens, including the unborn human being . . . ." The district court found § 7(1)(b) violated physicians' First Amendment rights because it "requires abortion doctors to enunciate the State's viewpoint on an unsettled medical, philosophical, theological, and scientific issue, that is, whether a fetus is a human being." Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 375 F. Supp. 2d 881, 887 (D.S.D. 2005).

The Court essentially agrees with the district court's analysis. Even though the Act defines "human being" as a "member of the species Homo sapiens," including at the fetal or embryonic stage, the Court finds this statutory definition irrelevant because most patients, upon encountering the phrase "human being,"are likely to construe it in the broad, general sense of "person." Ante at 9. Having determined that the legislated definition is irrelevant, the Court then upholds the district court's preliminary determination that the statement required by § 7(1)(b) is ideological in nature, rather than objectively medical or scientific. Ante at 9-10. The Court supports this conclusion by reference to the legislative fact, established in Roe and approved in later cases, that a fetus is not a "person" and that there is no medical, scientific or moral consensus as to when life begins. Ante at 10-11. Finally, the Court reasons that, because the required disclosure is ideological, it violates the physicians' right not to speak, regardless of the physicians' right to disassociate from the message delivered. Ante at 12-13.

In my view, the Court perpetuates an error in the district court's essential premise. The Court's reasoning turns upon the premise that the language of § 7 of the Act establishes a script for the required disclosure that includes the term "human being," unaccompanied by the limiting definition in § 8. Based upon this premise, the Court concludes that the disclosure will be interpreted to state that the abortion will terminate the life of a "person." Ante at 9. In other words, although the provision is not inherently ideological if the statutory definition of "human being" is substituted, the Court finds that it is likely to be interpreted as ideological in practice. Ante at 9. However, the Act contains no indication that a physician must provide a written script of the exact words of § 7 to the patient. Section 7 bears no quotation marks to identify mandatory language. Rather than providing a scripted disclosure statement, § 7 merely directs the physician to categories of information that must be conveyed. Thus, the physician must give, inter alia, his or her name in writing, §7(1)(a), a statement that the woman enjoys a legally protected relationship that will be terminated if she receives an abortion, § 7(1)(c), (d), and a "description of all known

-34-

medical risks of the procedure," "including" certain subcategories, § 7(1)(e). This last provision illustrates well that § 7 is not meant to establish a script, as the provision itself does not purport to contain an exhaustive list of the risks to be described to the patient.

If the language in § 7(1)(b) is not a script, which it surely is not, then there is no justification for ignoring the legislature's definitions for the terms used in the Act. See, e.g., S. D. Warren Co. v. Maine Bd. of Envtl. Prot., 126 S. Ct. 1843, 1847 (2006) (resorting to a term's "ordinary or natural meaning" because "it is neither defined in the statute nor a term of art"); FDIC v. Meyer, 510 U.S. 471, 476 (1994) ("In the *absence* of such a [statutory] definition, we construe a statutory term in accordance with its ordinary or natural meaning.") (emphasis added). While it is true that the Act requires the physician to tell the patient that she will be terminating the life of a "human being," the definition makes clear that this means only that the physician must inform the patient that she is terminating a "living member of the species of Homo sapiens" in the embryonic or fetal stage. § 8(4). Precisely the same disclosure would be required if, instead of "human being," § 7(1)(b) required the physician to tell the patient that she would be terminating a "member of the class defined in § 8(4)." Just as there would be no need to resort to the dictionary definition of the word "member" to interpret the disclosure required in that case, there is no need to resort to the dictionary definition of "human being" to interpret the Act as written.[10]

---

[10]The Court's interpretation of the Act also creates a constitutional issue where none need be found. Even if the Act could be read to require a recitation of the exact language of § 7(1)(b), including the term "human being" with no limiting definition, the reading presented here is at least equally permissible. Because the reading presented here avoids any constitutional doubts, it is to be preferred. See, e.g., Gomez v. United States, 490 U.S. 858, 864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."); see also United States v. X-Citement Video, Inc., 513 U.S. 64, 69 (1994) (the Court presumes "that a statute is to be construed where fairly possible so as to avoid substantial constitutional

There is no doubt that certain terms take on freighted meanings in the abortion context, and there is every indication that the South Dakota legislature structured § 7(1)(b) with the term "human being" to broadcast to its constituents its strong preference for childbirth over abortion. However, the decision to embed the narrower, less controversial intended meaning of the term in the "Definitions" section should not cloud our analysis of the disclosures actually required for compliance with the Act. In the most practical terms, having reviewed the Act, I find no legitimate reading of it that would allow the State to prosecute a physician who failed to use the term "human being" in the required disclosures, or who used the term "human being" but told the patient that the term had only the limited meaning of a "living member of the species of Homo sapiens, including [an] unborn human being."

Accordingly, the proper inquiry for the Court is whether a disclosure that the abortion will terminate the life of a whole, separate, unique, living unborn member of the species of Homo sapiens is truthful, non-misleading and not impermissibly ideological.[11] I find no evidence in the record to suggest otherwise. The declarations

_____

questions").

[11]Regarding the proper test for "impermissible" ideological content, I am not convinced that the State is prohibited from distributing, through the channel of the physician, any ideological view whatsoever. The Court notes that Casey "did not need to confront Justice O'Connor's concern in City of Akron . . . that 'informed consent provisions may . . . violate the First Amendment rights of the physician if the State requires him or her to communicate its ideology,'" ante at 8-9 (quoting City of Akron, 462 U.S. at 472 n.16 (O'Connor, J., dissenting)), but the decision of the Casey plurality not to expressly address a single footnote in a previous *dissent* on the same topic does not convert that dissent into the controlling precedent on "ideology" in the informed consent context. Although the Court distinguishes the Act from the statute at issue in Casey as one that requires physicians "to deliver ideological messages themselves," ante at 8, the provisions at issue only require physicians to provide a written statement containing information mandated by the State and certify to the best of their ability that the patient understands the State's information. It is important to remember that nothing in the Act requires the physician to represent to the patient,

from Planned Parenthood's witnesses, cited by the Court <u>ante</u> at 9-10, were premised on the broadest general meaning of "human being," rather than the statutory definition. Likewise, while a recitation conveying the idea that an unborn child is a whole, separate, unique, living "human being" in the general or colloquial sense might conflict with legislative facts originating in <u>Roe</u> regarding legal personhood and the question of when life begins, this concern is not implicated where the terms "whole, separate, unique, living" are used to characterize an unborn member of the species Homo sapiens. Therefore, the Court's reliance on legislative factfinding to find a likelihood of success on the merits, <u>ante</u> at 10-11, is misplaced.

In essence, the statement that an abortion terminates a whole, separate, unique, living unborn member of the species Homo sapiens is nothing but an unremarkable tautology. It is simply a restatement of the definition of "abortion." "Abortion" is defined as "the termination of a pregnancy after, accompanied by, resulting in, or closely followed by the death of the embryo or fetus." <u>Merriam-Webster's Collegiate</u>

---

either affirmatively or through silence, that the written statement expresses the physician's personal or professional views.

<u>Casey</u> makes clear that the State may require the physician to serve as a channel for the State's information to some extent in the informed consent context, even for information that is non-medical. 505 U.S. at 881. <u>Casey</u> also holds that "the State may enact rules and regulations designed to encourage [the patient seeking an abortion] to know that there are *philosophic and social arguments of great weight* that can be brought to bear in favor of continuing the pregnancy to full term." 505 U.S. at 872 (emphasis added). Neither <u>Casey</u> nor any subsequent Supreme Court decision sets an express limit on the State's ability to require physicians to distribute information relevant to informed consent where such permissible "philosophic and social arguments" are included. It is difficult to conceive of any "philosophic and social arguments" the State could make that would not be expressive of the State's ideology. It is not necessary today to resolve what degree of ideology is impermissible, however, because the disclosure required by § 7(1)(b), *with* the legislated limited definition of "human being" incorporated, is not an ideological statement.

Dictionary (11th ed.). No one contends that the embryo or fetus is a member of any species other than Homo sapiens, and it is difficult to imagine the "death" of an entity that was not whole, separate, unique and living in some sense beforehand. Casey itself speaks in terms of "*the life* or potential life *of the unborn*." 505 U.S. at 870 (emphases added). Consequently, the disclosure required by § 7(1)(b) is truthful, non-misleading and non-ideological on its face and, therefore, does not violate Casey's standards for compelled speech by a physician in the context of disclosure requirements for informed consent to an abortion.[12]

---

[12]The Court distinguishes the Act from the statute at issue in Casey on the basis that the Act provides less leeway for a physician to choose not to obtain informed consent for medical reasons. Ante at 13-14. The Court is concerned that the Act requires the physician to obtain informed consent unless it is impossible due to a medical emergency. However, the 1993 version of the South Dakota informed consent statute likewise has only a medical emergency exception, rather than a broader exception like the statute at issue in Casey. In Miller, we considered and rejected the argument that the medical emergency-only exception rendered the 1993 version of the statute constitutionally infirm:

The only exception to the mandatory-information provision [S.D.C.L. § 34-23A-10.1 (1993)] is for a medical emergency.

South Dakota's provision is substantially similar to provisions upheld by the Supreme Court in Casey and by this Court in Fargo Women's Health Organization v. Schafer. The Pennsylvania provision approved of in Casey provided two exceptions not found here: the information on the father's liability for child support could be omitted for rape victims, and other information could be omitted if the physician reasonably believed that providing the information could severely hurt the patient's physical or mental health. Planned Parenthood contends that the lack of such exceptions in the South Dakota law makes it unconstitutional on its face.

We decided this issue in Fargo Women's Health Organization v. Schafer, where we upheld a North Dakota law similar to the one at issue here. The North Dakota law also lacked the particular exceptions provided by

-38-

The Court also holds that the Act constitutes an undue burden upon a patient's right to obtain an abortion because "[f]orcing [the patient] not only to read, but to sign each page of statement containing the state's moral and philosophical objections to the procedure she has planned and intends to undergo, and forcing her doctor to certify that she 'understands' these objections, does little to promote independent decision making and may actually exacerbate any adverse psychological consequences of the procedure." Ante at 15. However, as discussed above, the disclosures actually required by the Act do not include the State's "moral and philosophical objections." In addition, requiring a patient to sign or initial a form stating that she understands the information conveyed is common to most situations in which a patient must give informed consent to medical treatment. See, e.g., S.D.C.L. §§ 27A-8-15 (stating, in the context of admittance for voluntary treatment at a psychiatric health facility, that "[a]n informed consent as defined in § 27A-1-1(8) shall be obtained orally and in writing upon an application form which shall contain in bold print and simple language the substance of [the applicable law]."); 27A-1-1(9) (defining informed consent as "consent voluntarily, knowingly, and competently given . . . after conscientious explanation of all information that a reasonable person would consider significant to the decision in a manner reasonably comprehensible to general lay understanding").[13]

Pennsylvania, but we held that North Dakota's medical-emergency exception allowed it to pass constitutional muster. Because South Dakota's mandatory-information provision and medical-emergency exception are virtually identical to those we upheld in Schafer, Planned Parenthood's argument that they are unconstitutional must fail.

Miller, 63 F.3d at 1467 (citations omitted).

[13]The district court found that the Act's requirement that the physician certify, "to the best of his ability," that the patient "understands" the information provided, § 7(2)(d), could be read to criminalize any attempt by the physician to disassociate from the disclosure required by the State. The district court appeared to interpret the term "understands" as requiring physicians to bring about the patient's *agreement* with,

Finally, the Court's holding that the required disclosure poses an undue burden because it "may actually exacerbate any adverse psychological consequences of the procedure," ante at 15, creates a catch-22 that would undermine informed consent in general. The very purpose of informed consent is to ensure that a patient understands

_____

rather than understanding of, the information required by the State. This definition of "understands" is foreign to the law of informed consent. For example, if this standard applied to informed consent to receive an experimental medicine that might cause an increased risk of bleeding, a physician would need to certify, to the best of his or her ability, that the patient understands what is meant by the phrase "increased risk of bleeding." The physician would not, on the other hand, need to certify that the patient actually *agrees* with the stated risk level—something about which patients are entitled to form their own judgments. In short, the goal of the certification appears to be simply to ensure that the patient reads and "grasp[s] the meaning of" the information provided, rather than to ensure that the patient adopts those views as her own. See Merriam-Webster's Collegiate Dictionary (11th ed.) (defining "understand").

The district court was also troubled by the absence of an express provision allowing physicians to disassociate themselves from the State's required disclosures. We have found that express provisions allowing disassociation are relevant to our evaluation of informed-consent provisions. Schafer, 18 F.3d at 534. I note, however, that despite the absence of an express affirmative disassociation provision, nothing in the Act suggests that it is a criminal act for the physician to comment on the State's information or to provide additional information of his or her own choosing. It is therefore unclear where the Court finds "statutory ambiguity" on this point. See ante at 12. To read a criminal statute to criminalize an action because that action is not expressly stated to be legal would be to turn criminal law on its head. Any particular act—such as disassociating oneself from a written statement one is required by the State to provide—is innocent conduct unless it is expressly criminalized by an applicable statute. For example, the Act also fails to expressly allow the physician to talk about the gender of the fetus. Is it therefore ambiguous whether the Act criminalizes that speech? I think not. In short, I suspect that if the Act dealt with informed consent for any other medical procedure, any claim that the Act's failure to mention disassociation rendered it "ambiguous" on the subject would be deemed frivolous.

-40-

the long-term consequences of her actions. It often may be true that those disclosures increase anxiety at the same time that they increase the patient's understanding of the risks and consequences of her actions, but the purpose of informed consent is to ensure that the patient know these things *before*, not after, she chooses to have a procedure. Thus, in Casey, the Court reasoned that "[m]easures aimed at ensuring that a woman's choice contemplates the consequences for the fetus do not necessarily interfere with the right recognized in Roe." 505 U.S. at 873. Surely, information about "consequences for the fetus" increases the angst felt by a patient who is making a decision to terminate her pregnancy. Yet, under Casey, the State is allowed to present information that does just that, "reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." Id. at 882.

In summary, I would find that, on its face, the Act does not create an undue burden or violate physicians' First Amendment right not to speak. See Thornburgh v. Am. College of Obstetricians & Gynecologists, 476 U.S. 747, 757 (1986) (holding that it is permissible in some instances for appellate courts to rule on the merits of constitutional issues despite the fact that the appeal is from a preliminary injunction), overruled on other grounds by Casey, 505 U.S. at 882. The Act requires the physician to provide, and to certify to the best of his or her ability that the patient reads and grasps the meaning of, medical and legal information that is for the most part substantially identical to that which has been approved in previous cases. See, e.g., Schafer, 18 F.3d at 531. The novel required disclosures in § 7, a statement that the patient enjoys a relationship with the unborn child that is legally protected and a statement that abortion terminates the life of an unborn member of the species Homo sapiens, are likewise truthful and non-misleading, Casey, 505 U.S. at 882, and are "reasonable measure[s] to ensure an informed choice . . . which might cause the woman to choose childbirth over abortion," id. at 883. The physician must provide this information only as "part of the practice of medicine, subject to reasonable licensing and regulation by the State," id. at 884, and these requirements do not "plac[e] a substantial obstacle in the path of a woman seeking an abortion," id. at 877.

## IV. Conclusion

Rather than apply an all-or-nothing approach to enjoining the Act, I would examine each provision to determine whether an injunction is merited on a provision-by-provision basis. Having examined each provision, I would find as a matter of law that the provisions in question do not violate physicians' First Amendment rights and do not impose an undue burden on patients' rights to an abortion, without need for further development of the facts. As such, I would hold that the plaintiffs have no chance of prevailing on the merits of these issues, thereby obviating any need to examine the relative harms imposed by any temporary injunctive relief, and I would vacate the district court's judgment and dissolve the preliminary injunction.

_____